**Joseph A. CHAMPION, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–5412.

Court of Appeals of Alaska.

Dec. 29, 1995.

Hearing Denied Feb. 15, 1996.

Daniel Lowery, Assistant Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

James L. Hanley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for appellee.

Before: BRYNER, Chief Judge, and COATS and MANNHEIMER, Judges.

### OPINION

MANNHEIMER, Judge.

Joseph A. Champion appeals his convictions for first-degree burglary, As 11.46.300(a), and second-degree theft, As 11.46.130(a)(2), as well as the sentence he received for these crimes. We affirm.

#### Facts of the Case

In the early morning of January 13, 1993, Champion was looking for money to buy alcohol and drugs. Sometime between 1:00 and 1:30 a.m., he came to the residence of James Burton, a friend and former employer. Burton had previously lent money to Champion, and Champion hoped that Burton would lend him money now. No one was home at the Burton residence when Champion first arrived. However, as Champion waited for someone to answer the door, Burton's son Daniel and his friend Richard Gunder arrived at the house. Daniel lived with his father.

When Daniel told Champion that his father was not home, Champion asked permission to come inside to use the telephone. Daniel let Champion into the house. Daniel and his friend Gunder went into Daniel's bedroom while Champion used the phone. Within five minutes, Champion was done with the telephone; he let himself out of the house.

After Champion left, Gunder noticed that a "Street Sweeper" shotgun was missing from James Burton's gun cabinet. Daniel examined the cabinet and confirmed that the shotgun was missing. Because he was unsure whether his father had removed the shotgun, Daniel took no action. However, he did note that no other weapons were missing from the gun cabinet.

Because they expected the elder Burton to return home sometime during the night, the boys left the front door unlocked and went to sleep. Sometime between 7:00 a.m. and 7:30 a.m., Daniel Burton heard the sound of the front door closing. He got out of bed to investigate, but he found no one in the house and nothing out of the ordinary, so he went back to bed. About fifteen minutes later, Daniel heard the sound of the front door being opened; this time, it was his father returning home.

Daniel immediately told his father about Champion's visit and the missing "Street Sweeper" shotgun. When Daniel took the elder Burton to examine the gun cabinet, they found that two other firearms were now missing: a Remington 7mm magnum rifle with a scope, and a Browning .22 caliber rifle. James Burton called the police and reported the weapons missing.

Anchorage Police Officer Gary Barfuss arrived at the Burton house at about 9:00 a.m. to investigate. After Daniel Burton described the events of that morning, Barfuss put out a "locate" on Champion, his vehicle (a black, two-door Ford Festiva), and the three firearms.

A little later, the police received a report from a man named Robert Turner. Turner told the police that he had just been visited by Champion. Champion was in possession of a "Street Sweeper" shotgun; he had asked Turner to disassemble the weapon for him.

(Turner refused.) Turner also noticed two other weapons wrapped in a blanket in the back of Champion's car.

Around 11:00 a.m., William Fowler, a pawnshop owner, called the Anchorage Police Department to report seeing a "Street Sweeper" shotgun in the back seat of a car occupied by two men who had just pawned two other firearms. When the police interviewed Fowler, they learned that Champion and a friend, Stephen Coats, had come to the shop around 10:30 a.m.. Champion had two rifles with him—a Remington 7mm magnum and a Browning .22 caliber. Champion tried to pawn these rifles, but he was refused because he lacked the necessary identification. Thereupon, Champion's friend Coats agreed to pawn the weapons using his own identification. The two rifles were accepted for pawn, and Coats retained the pawn tickets (which were in his name).

At about 11:30 a.m., Investigator James Steeby spotted Champion's vehicle in the parking lot of an apartment building near 36th and Wyoming. Investigator Steeby radioed for back-up and maintained surveillance of the vehicle and its occupants. When Champion started to drive his car out of the parking lot, Steeby activated his siren and lights. However, Champion refused to stop; he drove off, and a high-speed chase ensued. During this chase, Champion and Coats threw the "Street Sweeper" out the window and into the street.

The police caught Champion and Coats and arrested them. Champion was indicted for burglary (for his second, unconsented-to entry into the Burton residence around 7:00 a.m.), three counts of second-degree theft (one count for each of the three firearms), and failing to stop at the direction of a police officer.

At trial, Champion conceded that he was guilty of failing to stop. However, Champion contended that he was innocent of burglary and theft. With regard to the theft charges, Champion admitted that he took the three firearms from the Burton residence, but argued that he lacked an intent to permanently deprive Burton of the firearms. He claimed that he had only borrowed the firearms so that he could get some ready money by

pawning them; Champion asserted that he intended to redeem the weapons shortly and then return them to Burton. The burglary charge involved Champion's second entry into the house, when he took the two rifles. With regard to this charge, Champion admitted that he had entered the Burton residence without permission, but he argued that this trespassory entry was not burglary because he had not intended to commit theft (that is, he intended to take the two rifles, but only temporarily). The jury convicted Champion on all counts.

## I

### The State Presented Sufficient Evidence to Support Champion's Convictions for Theft and Burglary

■ At the close of the prosecution's evidence, Champion asked the trial judge to grant him a judgement of acquittal. The superior court denied this motion. Champion challenges this ruling on appeal. Champion asserts that the government presented insufficient evidence to establish that he acted with intent to permanently deprive Burton of the firearms. Even assuming that the government was obliged to prove Champion's intent to permanently deprive Burton of this property (see the next section of this opinion), we find the evidence sufficient to support this element.

■ Champion's argument hinges on viewing the evidence in the light most favorable to himself. We, however, are obliged to view the evidence in the light most favorable to upholding the jury's verdict. *Simpson v. State*, 877 P.2d 1319, 1320 (Alaska App.1994). Even if Champion's act of pawning the two rifles was considered an ambiguous act (that is, an act that might be consistent with Champion's asserted intent to retrieve and return Burton's property), the jury could evaluate Champion's intent in light of his other conduct. The fact that Champion took the weapons surreptitiously at two different times, the fact that he asked Turner to dismantle the shotgun, the fact that he fled from the police, and the fact that he threw the shotgun into the road when the police were chasing him, all support a finding that

Champion intended to permanently deprive Burton of the firearms. We therefore uphold the superior court's denial of Champion's motion for judgement of acquittal.

## II

### The Relationship Between Champion's Conceded Intent to Pawn the Firearms, His Asserted Intent to Return a Short Time Later and Redeem the Firearms, and Alaska's Statutory Definitions of "Intent to Appropriate" and "Intent to Deprive"

As explained above, Champion defended the charges of burglary and theft by contending that, even though he took the firearms from Burton's residence without permission, he intended only to pawn the weapons and then redeem them and return them to Burton within a short time. Champion argued that, because he did not intend to permanently deprive Burton of his property, he was not guilty of either theft or burglary (which required proof of his intent to commit theft).

On appeal, Champion asserts that his trial jury received faulty instruction on the element of "intent to permanently deprive". The State responds by arguing that this was not an element of the crime at all—that Champion's intent to pawn the property was, itself, a sufficient culpable mental state for the crime of theft, and that it was irrelevant whether Champion intended to return the firearms to Burton.

For the reasons explained below, we agree with the State's construction of the theft statute. When Champion took the three firearms, intending to pawn them, he committed the crime of theft. This is true even if he intended to quickly redeem the rifles and return them to Burton.

A. *The Intent to Pawn Another's Property and the Culpable Mental States Required for Theft*

A person commits the crime of theft when, "with intent to deprive another of property or to appropriate property of another to oneself or a third person, the person obtains property of another". AS 11.46.100(1). In

the present case, Champion concedes that he "obtained" property belonging to another.[1] The question litigated at Champion's trial was whether he acted with one of the two alternative culpable mental states specified by the theft statute: an intent "to deprive another of property" and/or an intent "to appropriate property of another to oneself or a third person".

The legislature has provided definitions of both "appropriate" and "deprive". Under AS 11.46.990(2), "appropriate" means:

(A) exercise control over property of another ... permanently or for so extended a period or under such circumstances as to acquire the major portion of [its] economic value or benefit ...; or

(B) dispose of the property of another for the benefit of oneself or a third person[.]

Thus, the definition of "appropriate" in AS 11.46.990(2) focuses on the thief's intent to obtain benefit from the stolen property (either for himself or for a third person). By contrast, the definition of "deprive" in AS 11.46.990(8) focuses on the thief's intent to perform acts that will cause the owner to suffer loss or detriment. Under AS 11.46.990(8), "deprive" means:

(A) withhold property of another or cause property of another to be withheld from [its owner] for so extended a period or under such circumstances that the major portion of its economic value or benefit is lost to that person; [or]

(B) dispose of the property in such a manner or under such circumstances as to make it unlikely that the owner will recover the property; [or]

(C) retain the property of another with intent to restore it ... only if [the owner] pays a reward or other compensation for its return; [or]

(D) sell, give, pledge, or otherwise transfer any interest in the property of another; or

(E) subject the property of another to the claim of a person other than the owner.

Clearly, subsection (D) of this definition is the part most pertinent to the prosecution against Champion. Champion conceded that, when he took Burton's firearms, he intended to pawn the weapons and thereby obtain money to purchase alcohol and drugs. Champion's intent to pawn the firearms was an intent to "pledge or otherwise transfer an[ ] interest in [Burton's] property"—an intent that constitutes "intent to deprive" under AS 11.46.990(8)(D).

Thus, Champion conceded that he took the firearms from Burton's home without permission and that, when he did so, he acted with "intent to deprive" as defined in AS 11.46.990(8)(D). In fact, Champion further conceded that, with respect to the two rifles, he later accomplished this intent (by pawning them).

It would seem that there was nothing left to be litigated at Champion's trial. However, in a pre-trial memorandum, Champion asserted that AS 11.46.990(8)(D) implicitly required the government to prove not only that Champion acted with an intent to pledge or transfer an interest in the firearms but also that he concurrently intended to permanently deprive the owner of the property. That is, Champion argued that even if he took the firearms intending to pawn them, he still would not be guilty of theft if he also intended to redeem the firearms from pawn a short time later and return them to Burton. Over the prosecutor's objection, Judge Rene Gonzalez decided to give the jury the following instruction proposed by the defense:

One who takes another's property, intending at the time he takes it to use it temporarily and then return it unconditionally, within a reasonable time—and having a substantial ability to do so—lacks the intent to deprive required for the crime of theft. The act of pawning another's property, standing alone, is not strictly determinative of the issue of whether or not the state has proven an intent to deprive. It is merely one fact among others set forth in the evidence that you should consider in deciding the issue.

1. Under AS 11.46.990(11), one "obtains" property (a) when one "bring[s] about a transfer or a purported transfer of a legal interest in the property[,] whether to the obtainer or another", or (b) when one "exert[s] control over property of another".

This instruction was numbered 53. The instruction just before it, number 52, defined "deprive" in the language of AS 11.46.990(8). Thus, Instruction 52 told the jury that "intent to deprive" meant, among other things, an intent to "sell, give, pledge, or otherwise transfer any interest in the property of another". But the very next instruction, Instruction 53, told the jury that an intent to sell, give, pledge, or otherwise transfer an interest in the property was *not* sufficient to support Champion's conviction for theft—that the government needed to prove an additional (and undefined) "intent to deprive".

On appeal, the State renews its objection to Champion's (and the trial court's) construction of the statute. The State argues that when a defendant acts with intent to pledge or transfer an interest in the property of another, no additional intent is needed. That is, the State asserts that it was unnecessary to prove that Champion had an intent to permanently deprive Burton of his property; rather, Champion's intent to pawn the firearms was, by itself, the "intent to deprive" required to prove the crime of theft (and thus the crime of burglary).

### B. *The Common Law Does Not Control this Question*

When Judge Gonzalez ruled that Champion's intent to pawn Burton's property was not the culpable mental state required for theft, and that the State was required to establish Champion's intent to permanently deprive Burton of the property, he relied on the discussion of larceny in Wayne R. LaFave and Austin W. Scott, Jr., *Substantive Criminal Law* (1986), § 8.5(b), Vol. 2, pp. 359–362. With particular respect to the act of pawning another's property, *LaFave & Scott* declares:

> One who takes another's property intending at the time ... to use it temporarily and then return it unconditionally within a reasonable time—and having a substantial ability to do so—lacks the intent to steal required for larceny.

. . . .

> [Thus], an intent to pawn the property [of another], accompanied by an intent later to redeem the property and return it to its owner, is a defense [to larceny so long as] the taker's financial situation is such that he has an ability to redeem it.

*LaFave & Scott,* Vol. 2, pp. 359, 361.

There is a problem, however, with using this passage as a statement of Alaska law. *LaFave & Scott*'s discussion of the elements of larceny (§§ 8.1–8.5) is an attempt to review and summarize both the common-law crime of larceny and the various statutory redefinitions of this crime enacted by American legislatures. The text therefore contains broad statements of law that do not necessarily apply to Alaska's particular statutory definition of theft.

The fundamental question in Champion's case is to determine whether his intent to pawn Burton's property was a sufficient intent to "deprive" to support a theft conviction under Alaska law. Because the crime of theft (like every other crime in Alaska) is defined by statute, *see* AS 11.81.220; *Olp v. State,* 738 P.2d 1117, 1118 (Alaska App.1987), this question can not be answered merely by ascertaining the elements of larceny as that crime was defined at common law, nor merely by ascertaining the majority rule found among the larceny and theft statutes enacted by other states. This question can be answered only by ascertaining (if possible) the intention of the Alaska Legislature when it enacted the definition of "deprive" contained in AS 11.46.990(8).

Both the common law and the law of other states may be helpful in interpreting our legislature's intention. Moreover, we apply the established rule of statutory construction that larceny-type crimes are presumed to incorporate the element of "intent to permanently deprive" unless there is clear indication of a contrary legislative intention. *See Hugo v. Fairbanks,* 658 P.2d 155, 161 (Alaska App.1983). However, it is ultimately our legislature's intention that controls.[2]

---

**2.** For example, the courts of Arkansas, Georgia, and South Dakota have interpreted their theft statutes as not requiring proof of an intent to

permanently deprive. *Moore v. State,* 299 Ark. 532, 773 S.W.2d 834, 836 (1989); *Emmett v. State,* 199 Ga.App. 650, 405 S.E.2d 707, 709

C. *The Origins of the Definition of "Deprive" Contained in AS 11.46.990(8)*

Alaska's definition of "deprive" is based on the Model Penal Code, but it is not taken from the final version of that Code. As defined in § 223.0(1) of the final version of the Model Penal Code, "to deprive" means:

(a) to withhold property of another permanently or for so extended a period as to appropriate a major portion of its economic value, or with intent to restore [it] only upon payment of reward or other compensation; or

(b) to dispose of the property so as to make it unlikely that the owner will recover it.

American Law Institute, *Model Penal Code and Commentaries* (1980), Part II, Vol. 2, p. 124. As can be seen, this definition parallels three portions of Alaska's definition of "deprive": subsections (A), (B), and (C) of AS 11.46.990(8). However, the fourth and fifth portions of our statute, subsections (D) and (E), are not found in the final version of the Model Penal Code. Instead, subsections (D) and (E) come from the First and Second Tentative Drafts of the Model Penal Code.

Under § 206.1(1) of the First Tentative Draft, the crime of theft was defined as "appropriat[ing] property of another without his effective consent". The meaning of "appropriate" was set forth in § 206.1(2), and it was expressly defined as including several types of temporary deprivations:

(a) *Generally.* Subject to paragraphs (b) to (e), to appropriate means:

(i) to exert unauthorized control over property of another, other than immoveable realty, with the purpose of depriving the owner thereof; or

(ii) to acquire title or any other right in or with respect to any property of another.

. . . .

(c) *Temporary Use.* A purpose to deprive of temporary use of moveable property, or an acquisition of a right to such use, shall suffice for an appropriation if and only if:

(i) the use is to be so prolonged as to constitute a substantial portion of the useful life of the property; or

(ii) the property is to be subjected to a risk of permanent loss or substantial injury so high as to manifest an indifference as to whether the property is restored intact to its owner; or

(iii) the property is to be sold, pledged, given away or otherwise subjected to a claim adverse or superior to that of the owner, whether or not the claim is legally valid; or

(iv) the property is to be restored to the owner by selling or leasing it back to him, or conditionally upon payment of a reward, or by any other transaction implying that the actor is entitled to retain control; or

·(v) the actor's purpose is to evade payment of a charge ordinarily imposed for the use of the property.

American Law Institute, *Model Penal Code, Tentative Draft No. 1* (1953), pp. 51–52. The commentary to subsection (c) states that the five categories of temporary takings listed here were intended to make "some temporary deprivations [of property] thefts, viz., those that involve a substantial risk of total loss in some contingencies". *Id.*, p. 71.

The First Tentative Draft states that a temporary taking becomes theft "if and only if" the defendant's intent is to do one of the types of things listed in the five subparagraphs, (i)–(v). Thus, the act of taking someone else's property temporarily (that is, with intent to restore it after a reasonable time) would not, by itself, be sufficient to support a charge of theft. Rather, it is the defendant's further intent to subject the property to substantial risk of loss (by, for example, pledging the property or doing some other act that subjects the property to a third party's legal claim) that makes the defendant's conduct theft.

The Model Penal Code's classification of certain types of temporary takings as theft was carried forward to the Second Tentative Draft. Section 206.6(1) of the Second Tentative Draft stated:

(1991); *State v. James,* 39 S.D. 263, 164 N.W. 91, 93 (1917).

*Prolonged or Seriously Prejudicial Deprivation.* A person who secures or exercises temporary control over movable property of another without his consent ... commits theft if:

   (a) he deprives the owner of it for a period so prolonged as to constitute a material impairment of the total beneficial enjoyment of the property; or

   (b) he uses or abandons the property in such a way as to manifest an indifference as to whether it will be restored to the owner; or

   (c) he sells, gives, pledges or otherwise transfers the property, or subjects it to a claim adverse or superior to that of the owner, whether or not the claim is legally valid; or

   (d) he intends to restore the property only on condition that the owner pay a reward or buy back [the property] or make any other compensation.

American Law Institute, *Model Penal Code, Tentative Draft No. 2* (1954), p. 87. Again, the accompanying commentary explicitly states the Code's intention to impose "theft liability for all these cases of substantial subversion of the owner's dominion over his property". *Id.,* p. 88.

But in the final version of the Code, the drafters dropped the list of temporary takings that constituted theft. In place of this list, the drafters substituted a new definition of "deprive"—the definition now found in § 223.0(1). To reiterate, the Model Penal Code now defines "to deprive" as:

   (a) to withhold property of another permanently or for so extended a period as to appropriate a major portion of its economic value, or with intent to restore [it] only upon payment of reward or other compensation; or

   (b) to dispose of the property so as to make it unlikely that the owner will recover it.

In the commentary explaining this revised definition, the Model Penal Code drafters stated:

   The definition of "deprive" in Subsection (1) is new. The utility of the definition is that it provides a single concept embracing both a permanent and prolonged withholding of property from the rightful owner.... For want of such a concept, it was necessary in earlier drafts to provide separate sections dealing with permanent deprivations and "prolonged or seriously prejudicial deprivations." See Tentative Draft No. 1, Section 206.1(2); Tentative Draft No. 2, Sections 206.1(1) and 206.6(1).

American Law Institute, *Model Penal Code, Proposed Official Draft* (1962), p. 163.

In other words, it appears that the drafters of the Model Penal Code thought that the phrase "dispose of the property so as to make it unlikely that the owner will recover it" expressed the concept of the earlier drafts, but in a more compact and elegant manner. This interpretation is reiterated in the commentary that now accompanies the official draft of the Model Penal Code:

   *6. Purpose to Deprive.* ... The term "deprive" is defined in Section 223.0(1) to include permanent deprivations as well as certain instances in which the actor does not intend to deprive permanently or unconditionally.

   Although the common-law definition of larceny was often formulated in terms of an intent to deprive permanently, convictions were sustained upon evidence that fell considerably short of proving a purpose totally and finally to deprive another of his property.... Where the intent to return was contingent on payment of a reward or on repurchase by the owner, the jury was permitted to find an intent to deprive permanently on the theory that the objective was to deprive permanently if the owner refused to pay the reward or other demand. The fact that restoration to the owner is contingent, as when the taker pledges the property, has also been held to support conviction for larceny.

   •     •     •     •     •

   Under the definition of "deprive" in Section 223.0(1), a conviction for theft would be possible in each of these situations.

American Law Institute, *Model Penal Code and Commentaries* (1980), Part II, Vol. 2, p. 174.

Evidently, the drafters of Alaska's revised criminal code did not share the Model Penal Code drafters' view that the new language was an adequate substitute for the old. Even though Alaska's criminal code was written 15 years after the Model Penal Code was finished, Alaska's drafters did not use the final Model Penal Code definition of "deprive". Rather, the drafters of Alaska's criminal code went back to the tentative drafts of the Model Penal Code for the definition of "deprive" now codified in AS 11.46.990(8). From this, we conclude that the drafters of Alaska's criminal code made a conscious decision to adopt the position of the Model Penal Code tentative drafts—a conscious decision that these listed types of temporary takings should be punished as theft.

Among the types of "prolonged or seriously prejudicial" takings that the Model Penal Code classified as theft, one type was any taking done with the purpose of "s[elling], pledg[ing], giv[ing] away[,] or otherwise subject[ing] [the property] to a claim adverse or superior to that of the owner." *Model Penal Code, Tentative Draft No. 1*, § 206.1(2)(c)(iii). The drafters of the Alaska criminal code placed this provision in AS 11.46.990(8)(D)–(E):

> "deprive" or "deprive another of property" means to ...
>
> (D) sell, give, pledge, or otherwise transfer any interest in the property of another; or
>
> (E) subject the property of another to the claim of a person other than the owner.

Based on the foregoing history, it appears that AS 11.46.990(8)(D) was not intended to require proof of an intent to permanently deprive the owner, but only to require proof of one of the listed intents (to sell the property, or to give it away, or to pledge it, or to otherwise transfer an interest in the property).

### D. *The Comment to the Alaska Tentative Draft, and Why We Reject It*

Champion disputes the foregoing conclusion. He points to the following portion of the Criminal Code Revision Subcommission's commentary to the Tentative Draft's definition of theft:

> The definitions of "appropriate" and "deprive", TD [ ] 11.46.990(1) and (3), are used in determining the requisite intent on the part of the defendant to commit theft. The thrust of the definitions of "deprive" and "appropriate" is that they require a purpose on the part of the defendant to exert permanent or virtually permanent control over the property, or to cause permanent or virtually permanent loss to the owner of the possession or use of the property. Consistent with existing law, it is this feature that distinguishes theft from some other offenses which, while similar to theft, are satisfied by an intent to obtain only temporary possession or use of [the] property or to cause temporary loss to the owner (e.g., [joyriding] ).

*Alaska Criminal Code Revision, Tentative Draft*, Part 3, p. 20.

Because the tentative draft definitions of "appropriate" and "deprive" are essentially identical to the definitions ultimately enacted by the legislature, this commentary appears to be strong evidence that any theft under Alaska law requires proof of the defendant's intent to permanently deprive the owner (or, alternatively, the defendant's intent to permanently appropriate the property). However, the assertion in the commentary is simply not supported by the text of the criminal code itself.

First, the structure of AS 11.46.990(8) does not support the commentary. This statutory definition of "deprive" is divided into five subsections. Only subsection (A) contains an "intent to permanently deprive" clause:

> "[D]eprive" or "deprive another of property" means
>
> (A) withhold property of another or cause property of another to be withheld from that person permanently or for so extended a period or under such circumstances that the major portion of its economic value or benefit is lost to that person[.]

The other subsections of the definition do not contain "intent to permanently deprive" language:

> (B) dispose of the property in such a manner or under such circumstances as to

make it unlikely that the owner will recover the property; [or]

(C) retain the property of another with intent to restore it ... only if [the owner] pays a reward or other compensation for its return; [or]

(D) sell, give, pledge, or otherwise transfer any interest in the property of another; or

(E) subject the property of another to the claim of a person other than the owner.

If the statute were meant to embody the idea stated in the commentary, then one would expect to find the "permanently deprive" language of subsection (A) ("withhold property ... permanently or for so extended a period or under such circumstances that the major portion of its economic value or benefit is lost") in the introductory clause of the statute, where it would modify all of the subsections, rather than isolated in subsection (A).

The structure of AS 11.46.990(8) indicates just the opposite of what the commentary asserts. Because the five subsections of AS 11.46.990(8) are worded disjunctively (that is, because they are separated by "or", not "and"), a plain reading of the statute indicates that an "intent to deprive" will exist when the defendant intends to accomplish *any* of the results described in the five subsections of the statute.

Second, the assertion that the "intent to permanently deprive" specified in subsection (A) applies to the other four subsections of the statute is fundamentally illogical. If the government proves that the defendant acted with the intent to permanently deprive specified in subsection (A), this by itself is sufficient to support the defendant's conviction of theft, and there would be no need to prove that the defendant also acted with one of the intents specified in the other four subsections (such as the intent to sell or pawn the property).

■ In other words, if Champion and the commentary are correct, then subsections (B) through (E) are superfluous. One of the prime directives of statutory construction is to avoid interpretations that render parts of a statute "inoperative or superfluous, void or

insignificant". *22,757 Square Feet, more or less v. State,* 799 P.2d 777, 779 (Alaska 1990).

E. *Champion's Intent to Pawn the Weapons was a Sufficient Culpable Mental State to Support his Convictions for Theft and Burglary*

■ Having examined the origins of AS 11.46.990(8), the structure of that statute, and the logic of its provisions, we reject Champion's contention that all thefts require the "intent to permanently deprive" specified in AS 11.46.990(8)(A). Rather, theft can be premised on proof of any of the culpable mental states listed in the five subsections of AS 11.46.990(8). If Champion took Burton's firearms with the intent of pawning them, this was a sufficient culpable mental state to support Champion's convictions for theft. We disapprove any suggestion to the contrary in *Ace v. State,* 672 P.2d 159, 162 n. 1 (Alaska App.1983), and in *Hugo v. Fairbanks,* 658 P.2d 155, 160 (Alaska App.1983). Similarly, if Champion broke into Burton's house to accomplish this goal (pawning the weapons), this was a sufficient culpable mental state to support Champion's conviction of burglary.

F. *The Defects in the Jury Instructions, the Trial Judge's Response to the Jury's Question, and the Definition of "Dispose of"*

■ We now must return to Champion's original argument: that the trial judge misinstructed the jury on the element of "intent to permanently deprive". As just explained, we agree that the jury instructions on this element were incorrect—but the error ran in Champion's favor. Correct instructions would have informed the jury that Champion could be convicted upon proof that he intended to pawn the property, and without proof that he intended to permanently deprive the owner.

The State argues that we should affirm Champion's conviction because the error in the jury instructions unlawfully benefited Champion. The issue is not that simple.

As described above, the jury was explicitly told in Instruction 53 that Champion's intent to pawn the firearms was not, by itself, a

sufficient intent to "deprive" to support a theft conviction. Because of this error, we can be fairly sure that when the jurors voted to convict Champion of theft and burglary, they did not rely on the construction of "intent to deprive" which we have just explicated in this opinion (that an intent to pawn someone else's property is, itself, an "intent to deprive").

It appears that the jurors, trying to reconcile the instructions dealing with the culpable mental state of "intent to deprive", turned to the alternative culpable mental state that can support a theft conviction, the intent to "appropriate". We infer this because, during its deliberations, the jury asked a question related to this culpable mental state.

Jury Instruction 51 defined the term "appropriate" based on the wording of AS 11.46.990(2). This instruction stated:

> "Appropriate" or "appropriate property of another to oneself or to a third person" means to exercise control over property of another ... permanently or for so extended a period or under such circumstances as to acquire the major portion of the economic value or benefit of the property.
>
> OR
>
> "Appropriate" or "appropriate property of another to oneself or to a third person" means to dispose of the property of another for the benefit of oneself or a third person.

The jury's question concerned the second part of this definition. The jurors' note to Judge Gonzalez read, "We are needing a definition of the term "disposal" as it relates to appropriation [as defined in] Instruction 51."

When Judge Gonzalez asked the parties for suggestions on how to answer the jury's question, Champion's attorney proposed that the jury be told that "disposal" refers to an act causing permanent or virtually permanent loss. The prosecutor responded that Champion's suggestion confused "disposal" with the culpable mental state that accompanies the act of disposal. She argued:

> PROSECUTOR: "[D]ispose of the property of another" ... means to simply get rid of it, which I think is the common

usage—to give it away to someone, sell it, pawn it, to get money for it. It's simply to get rid of it.... I think the idea of permanent deprivation is covered in the other jury instructions.

Jury Instruction 51, like AS 11.46.990(2) itself, does not use the term "disposal"; rather, both the instruction and the statute use the phrase "dispose of". This phrase is not defined in Title 11. However, the dictionary definitions of "dispose of" are:

1) to deal with conclusively; settle

2) to give away or sell

3) to get rid of; throw away

*Webster's New World Dictionary of American English* (Third College Edition, 1988), p. 396.

These definitions support the prosecutor's argument. The gist of "dispose of" is the actor's termination of his or her connection with the object (definitions 2 and 3), or the actor's dealing with the matter or the object in a way that will apparently require no further attention from the actor (definition 1).

In the context of theft, a thief "disposes of" property when the thief performs an act that either terminates the thief's connection to the property or, alternatively, leaves the property in a place or situation that apparently requires no further attention from the thief. However, as the prosecutor noted, an intent to "dispose of" the property is not sufficient, by itself, to establish the crime of theft. An additional culpable mental state must be proved.

AS 11.46.990(2)(B) states that an intent "to appropriate" means an intent to

> dispose of the property of another for the benefit of oneself or a third person[.]

Thus, the government not only must prove that the defendant obtained the property with an intent to "dispose of" it, but must also prove that the defendant acted with the concomitant intent to obtain benefit through this act of disposal (benefit either for himself or for a third person).

When the defense attorney suggested that the jury be told that "dispose of" refers to an act that causes permanent or virtually per-

manent loss to the owner, the defense attorney confused an intent to "appropriate" with an intent to "deprive". Under AS 11.46.100(1), theft requires proof of *either* an intent to appropriate *or* an intent to deprive. As we have already discussed, the definition of "deprive" in AS 11.46.990(8) focuses on the thief's intent to perform acts that will cause the owner to suffer loss or detriment. In contrast, the definition of "appropriate" in AS 11.46.990(2) focuses on the thief's intent to obtain benefit from the stolen property (either for himself or for a third person). Thus, as the language of AS 11.46.990(2) itself declares, an intent to "dispose of" someone else's property must be accompanied by an intent to obtain benefit, not an intent to perform acts that will cause loss or detriment.

From the foregoing, it is apparent that even though Champion's declared intent to redeem Burton's firearms from pawn was not a defense to theft under an "intent to deprive" theory, it was at least a colorable defense to theft under an "intent to appropriate" theory. To prove "intent to appropriate", the government would have to prove that Champion intended to "dispose of" the firearms—that he intended to perform an act that would either terminate his connection to the property or place the property in a situation that (at least in Champion's contemplation) would require no further attention from him. If Champion intended to pawn the firearms and then simply walk away with the money and terminate his connection with the property, this would be an intent to "dispose of" the firearms. On the other hand, if (as Champion asserted) he intended to return a short time later and redeem Burton's firearms from pawn, Champion could plausibly argue that he did not act with an intent to "dispose of" the property.

We thus come full circle. The jury, in erroneous Instruction 53, was told that Champion's intent to pawn the firearms was not a sufficient "intent to deprive" to support a theft conviction. The jurors therefore sought to analyze Champion's case under an "intent to appropriate" theory. Under this theory, Champion would have a colorable defense if he intended to return shortly to the pawn shop, redeem the pawned firearms, and expeditiously restore them to Burton.

That is, under an "intent to appropriate" theory, Champion was entitled to raise essentially the same defense that he would have been able to raise at common law: the defense that his intent to pawn the property was ambiguous—that he would not be guilty of theft if he intended only "to use [Burton's property] temporarily and then return it unconditionally within a reasonable time", so long as he had "a substantial ability" to redeem the firearms from pawn. *LaFave & Scott*, Vol. 2, pp. 359, 361.

Judge Gonzalez answered the jury's inquiry by referring the jurors to three lines from Instruction 52 (the instruction defining "deprive"). The judge told the jurors, "[T]he concept of disposal is already defined for you in Instruction No. 52. I refer you to lines six, seven, and eight of Instruction 52." These lines read:

> ["Deprive" or "deprive another of property" means to] [d]ispose of the property in such a manner or under such circumstances as to make it unlikely that the owner will recover the property.

■ As Champion points out on appeal, the sixth through eighth lines of Instruction 52 do not (syntactically speaking) define the phrase "dispose of"; rather, these three lines are simply a place in the instructions where "dispose of" is used.[3] However, just as a purported error in a jury instruction must be evaluated in the context of the instructions as a whole, *Baker v. State,* 905 P.2d 479, 490 (Alaska App.1995), we must analyze Champion's contention in light of the complete exchange between the jurors and the court. Judge Gonzalez explicitly told the jurors that these three lines of Instruction 52 *did* define "the concept of disposal". We therefore readily conclude that the jurors understood the court's response to mean that, in order to find that Champion had acted with an intent to "dispose of [Burton's] property for the

---

**3.** We note that the alternative response suggested by Champion's trial attorney contained the same syntactical defect. It, too, failed to define "disposal" and instead concentrated on the culpable mental state that should accompany the act of disposal.

benefit of [himself] or a third person", the jurors were required to find that Champion intended to deal with the property "in such a manner or under such circumstances as to make it unlikely that [Burton would] recover the property".

In the context of Champion's case, this instruction was the equivalent of the common-law defense that Champion had argued for all along. Champion conceded that he took Burton's firearms with the intent to pawn them. Champion's defense, based on the common law of larceny, was that he was not guilty of theft because (1) he intended to quickly redeem the property and return it to Burton, and (2) he had the financial ability to do this. When Judge Gonzalez responded to the jurors' question, he instructed them that an intent to "dispose of ... property" required an intent to deal with the property "in such a manner or under such circumstances as to make it unlikely that the owner will recover the property". For the jurors to make this finding, they would necessarily have to reject Champion's defense—his assertion that he possessed both the intent and the financial ability to quickly redeem the firearms and restore them to Burton.

We therefore conclude that, even though the jury instructions did not accurately reflect the law of theft, this did not prejudice Champion's right to a fair trial. In fact, because of the flaw in the jury instructions, Champion was able to present a defense that he was not entitled to, and the jurors were instructed that it was their duty to acquit Champion unless they rejected this defense beyond a reasonable doubt. Thus, the error benefited Champion.

### III

*Was Champion a Second–Felony Offender for Purposes of Presumptive Sentencing?*

In 1985, following a jury trial, Champion was convicted of attempted first-degree robbery. Superior Court Judge James A. Hanson gave Champion a suspended imposition of sentence (SIS), *see* AS 12.55.085, and placed Champion on probation for five years. A few months later, Judge Hanson found that Champion had violated the terms of his probation; the judge revoked Champion's SIS probation and sentenced Champion to 4 years' imprisonment with 2½ years suspended. This 2½ years was suspended on condition of Champion's successful completion of probation until December 2, 1989.

Following his release from jail, Champion began his felony probation. Because of additional violations, Champion's probation was extended by several months. On June 15, 1990, Superior Court Judge Mark A. Rowland signed an order discharging Champion from probation. Apparently believing that Champion had just successfully completed his original SIS probation, Judge Rowland further directed that Champion's attempted robbery conviction be set aside.

Three years later, in June 1993, following Champion's conviction in the present case, the District Attorney's Office returned to Judge Rowland and asked him to rescind his order setting aside Champion's earlier felony conviction. The State alerted Judge Rowland to the fact that Champion had not successfully completed his SIS probation—rather, Champion's SIS had been revoked, he had received a regular felony sentence which included probation, and it was this felony probation that Champion completed in June 1990.

Champion did not dispute the State's assertions of fact. He argued, however, that the State's motion was untimely. Champion also argued that, even if the State's motion was timely, Judge Rowland lacked authority to correct his mistake now. Despite Champion's procedural objections, Judge Rowland rescinded his earlier order and reinstated Champion's attempted robbery conviction.

Eleven months later, Champion appeared for sentencing in the present case. He asked Superior Court Judge Rene Gonzalez to treat him as a first-felony offender for presumptive sentencing purposes—that is, to ignore Judge Rowland's order reinstating the 1985 attempted robbery conviction. Judge Gonzalez ruled that the set-aside had been erroneous, that Judge Rowland had had no authority to set aside Champion's 1985 conviction, and that Judge Rowland had therefore properly rescinded the set-aside order.

On appeal, Champion renews his argument that Judge Rowland was powerless to modify the erroneous set-aside order, and that therefore Judge Gonzalez was obliged to treat Champion as a first-felony offender for presumptive sentencing purposes. This issue is directly controlled by *Richey v. State*, 717 P.2d 407 (Alaska App.1986).

Like Champion, the defendant in *Richey* sought to be declared a first-felony offender for presumptive sentencing purposes even though he had previously been convicted of a felony. Like Champion, Richey had received an SIS for a prior felony conviction; and, as in Champion's case, the superior court later revoked Richey's probation and imposed a normal felony sentence. Still later, again as in Champion's case, the superior court mistakenly issued an order purporting to set aside Richey's conviction. 717 P.2d at 410.

As Richey approached sentencing for his second felony, he argued that the erroneous set-aside order controlled his sentencing status—that the superior court was obliged to treat him as a first-felony offender. This court rejected Richey's argument:

> We believe it apparent that Judge Rowland's set-aside order did not affect the status of Richey's 1977 forgery conviction. The order must be deemed a nullity because Judge Rowland had no authority to issue it.... The plain language of [AS 12.55.085(d) and (e)] authorizes the sentencing court to set aside a conviction only when a defendant, following a term of probation incidental to a suspended imposition of sentence, has been discharged from pro-
> bation "without imposition of sentence." The obvious intent of this provision is to allow set-aside orders to be entered only in cases where a sentence has never formally been imposed against a defendant. Here, ... Judge Rowland had already rescinded Richey's suspended imposition of sentence and had formally imposed sentence. Richey was never discharged from probation under AS 12.55.085(d). [Thus,] Judge Rowland had no authority to set aside his conviction under AS 12.55.085(e).

*Richey*, 717 P.2d at 410–11.

Champion argues that *Richey* was wrongly decided. He cites *Holt v. Powell*, 420 P.2d 468, 471 (Alaska 1966), for the proposition that "[a] collateral attack [on a judgement] may be made only when the judgment is void". Champion contends that, even though a set-aside order might be demonstrably erroneous, it can never be "void" because judgements are "void" only when the issuing court lacks either personal or subject matter jurisdiction. Champion points out that the superior court has general jurisdiction over criminal proceedings. *See* AS 22.10.020(a). Thus, Champion argues, even though Judge Rowland mistakenly issued the set-aside order, he nevertheless had jurisdiction to issue the order, and it is therefore not "void" (although it might be "voidable").[4]

The rule that Champion relies on does not apply to the facts of his case. First, it appears that the State filed a direct attack, not a collateral attack, on Judge Rowland's set-aside order.[5] Second, and more ultimate-

---

**4.** In *Holt v. Powell*, the supreme court relied on § 11 of the original Restatement of Judgments (1942) for the rule that a judgement can be collaterally attacked only if it is "void". The court relied on the commentary to § 11 (which recapitulates § 8 of the Restatement) for its definition of "void". 420 P.2d at 471, nn. 8–12. Fourteen years after *Holt v. Powell* was decided, the American Law Institute promulgated the Second Restatement of Judgments (1980). The Second Restatement specifically renounces the classification of judgements into those that are "void" and those that are merely "voidable". *See* section (c) of the Introductory Note to Chapter 5, "Relief from a Judgment". Moreover, the Second Restatement no longer draws a hard-and-fast line between direct and collateral attacks on prior judgements (although collateral attacks are still disfavored). *See* section (b) of the Introductory Note to Chapter 5, and §§ 78–80 of the Second Restatement.

While the Second Restatement gives reason to believe that the rule stated in *Holt v. Powell* might be modified if the issue came up again, this opinion is written using the rule in *Holt*, interpreting its meaning by referring to the definitions used in the First Restatement.

**5.** As defined in *Black's Law Dictionary* (5th edition, 1979), p. 237, a "collateral attack" is

> [a]n attack on a judgment in any manner other than [in an] action or proceeding[ ] whose very purpose is to impeach or overturn the judgment; or, stated affirmatively, a collateral attack on a judgment is an attack made ... in an action or proceeding that has an independent purpose other than impeaching or overturning the judgment.

ly more important, Judge Rowland's set-aside order was "void" (as *Holt v. Powell* and the 1942 Restatement of Judgments used that term). Because the judgement was void, it could be attacked either directly or collaterally.

In *Holt v. Powell*, the supreme court stated:

A judgment is void where the state in which the judgment was rendered had no jurisdiction to subject the parties or the subject matter [of the litigation] to its control, or where the defendant was not given proper notice of the action and [the] opportunity to be heard, or where the judgment was not rendered by a duly constituted court with competency to render it, or where there was a failure to comply with such [other] requirements as are necessary for the valid exercise of power by the court.

420 P.2d at 471 (footnotes omitted). As authority for this passage, the court relied on section (b) of the commentary to § 11 of the 1942 Restatement of Judgments. That commentary explicitly relies on § 8 of the 1942 Restatement:

*Requirements for Exercise of Court's Power.*

A judgment is void if there is a failure to comply with such requirements as are necessary for the exercise of power by the court.

Section (a) of the comment to § 8 explains this rule:

Even though [the court rendering the judgment] has jurisdiction over the defendant and the court has competency [i.e., subject matter jurisdiction] to render such a judgment, the judgment may nevertheless be void because of a failure to comply with requirements of the law of the State for the valid exercise of power by the court. The validity of the judgment depends upon whether or not the requirements are jurisdictional.

See also *Restatement of Judgments* (1942), section (a) of the comment to § 11: "The [initiation] of proceedings in the action in which a judgment is rendered to have the judgment vacated or re-

In section (d) of the same comment, the Restatement refers to case law holding that judgements issued on Sunday, judgements issued while the court is on vacation, and judgements issued when the court is not sitting at its normal place, are "void" (not merely "voidable") and subject to collateral attack. (The comment does note that the "present tendency"—as of 1942—is to be stricter about which judgements can be collaterally attacked.)

■ Judge Rowland did not have any authority to set aside Champion's attempted robbery conviction except to the extent expressly authorized by the legislature. As the supreme court held in *Davenport v. State*, 543 P.2d 1204, 1210–11 (Alaska 1975), and as this court reiterated in *State v. T.M.*, 860 P.2d 1286 (Alaska App.1993),

[T]he superior court has no inherent power to retain jurisdiction over a criminal case and modify its judgement based on later events. Any power the superior court might have to modify a criminal judgement must stem from a statute or a rule.

*T.M.*, 860 P.2d at 1288.

In AS 12.55.085(e), the legislature gave the superior court the power to set aside a criminal conviction in one specific circumstance: if the defendant originally received a suspended imposition of sentence *and* if the defendant is later discharged from his or her SIS probation "without imposition of sentence". Because the superior court had already revoked Champion's SIS probation and had imposed a normal felony sentence on him, there was no jurisdictional basis for Judge Rowland's order setting aside his conviction. Under these circumstances, there was a "failure to comply with requirements of [state] law ... for the valid exercise of power by the court". *Restatement of Judgments* (1942), section (a) of the comment to § 8.

The order purporting to set aside Champion's 1985 conviction was "void" for purposes of the 1942 Restatement and the rule stated in *Holt v. Powell*. This order could be attacked either directly or collaterally. As this

versed or modified by appropriate proceedings[,] either in the trial court or in an appellate court[,] is a direct attack on the judgment."

court stated in *Richey,* such an order is a nullity. 717 P.2d at 411.

Although Judge Rowland expressly rescinded his earlier set-aside order after he discovered that it had been entered in error, no explicit rescission was necessary. The set-aside was void from the beginning. Judge Rowland's rescission order did not change the legal status of Champion's attempted robbery conviction; rather, it declared that legal status.[6] We therefore uphold Judge Gonzalez's ruling that Champion was a second-felony offender for presumptive sentencing purposes. This, however, does not end the matter.

■■■ In his argument to Judge Gonzalez at the sentencing hearing in the present case, Champion's attorney asserted that he and Champion had acted in reasonable and detrimental reliance on Champion's apparent status as a first-felony offender:

> DEFENSE ATTORNEY: I ... have concerns about the Court of Appeals, in the *Richey* case, claiming that [an] action [such] as Judge Rowland took is a "nullity", because it's not a nullity. It happened. And, indeed, as [set] forth in [my] affidavit ... in this case, it was relied upon by the parties in making some very serious and important decisions—particularly, the plea negotiation process, [when we were] trying to ascertain whether Mr. Champion should accept an offer from the State[.]

Champion's attorney did not elaborate further, and the affidavit to which he refers is not contained in the record on appeal. Thus, the facts that underlie the attorney's assertion· are not before this court. Because any claim to relief that Champion may have necessarily depends on facts outside the present record, such a claim is not properly presented in a direct appeal. *Compare Barry v. State,* 675 P.2d 1292, 1295–96 (Alaska App. 1984) (claims based on ineffective assistance of counsel must be pursued under Criminal Rule 35.1 for this same reason).

IV

*Did Judge Gonzalez Err When He Rejected Champion's Assertion that the Burglary of Burton's Residence was Among the Least Serious Within the Definition of First–Degree Burglary?*

■■■ At sentencing, Champion argued that his burglary offense was mitigated under AS 12.55.155(d)(9)—that his conduct was among the least serious within the definition of first-degree burglary. Champion asserted that the crime of burglary is punished so severely because of the terror it instills, or can instill, in the occupants of the building. Champion argued that, because he was a friend of the Burton family and a frequent visitor to their home, his surreptitious entry into the Burton residence did not have much potential to instill terror in the Burtons, and thus his burglary was among the least serious.

■■■ Judge Gonzalez rejected this proposed mitigator. On appeal, we must uphold Judge Gonzalez's ruling unless we are convinced that it is clearly erroneous. *Lepley v. State,* 807 P.2d 1095, 1099 n. 1 (Alaska App. 1991).

As Judge Gonzalez noted, the fact that Champion was a friend of the Burtons cut both ways. Assuming that it might be less frightening for a homeowner to find that an intruder is a known acquaintance instead of a stranger, the fact remains that a "friend" who burglarizes a house violates the trust of the person who let the "friend" frequent the house and become acquainted with the location of the homeowner's valuables. *See Wesolic v. State,* 837 P.2d 130, 135 (Alaska App. 1992). We also note that, because Champion stole firearms from the Burton residence, his crime would have been first-degree burglary under AS 11.46.300(a)(2)(A) even if the burglarized building had not been a dwelling. *Wesolic,* 837 P.2d at 133–34.

Finally, we note that Alaska law classifies the burglary of any dwelling, occupied or not, as first-degree burglary. *See* AS 11.46.300(a)(1) and its legislative commen-

---

**6.** For these same reasons, we reject Champion's argument that the doctrine of *res judicata* barred

Judge Rowland from re-examining his set-aside order.

tary, 1978 Senate Journal, Supp. No. 47 (June 12), pp. 43–44. The classification of all residential burglaries as first-degree burglaries indicates that the legislature placed emphasis on the burglar's violation of the homeowner's expectations of privacy and security.

For these reasons, we conclude that Judge Gonzalez could properly reject Champion's proposed mitigator.

*Conclusion*

The judgement of the superior court is AFFIRMED.