**Keen SMITH, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–10512.**

Court of Appeals of Alaska.

April 30, 2010.

Blair M. Christensen, Assistant Public Advocate, and Rachel Levitt, Public Advocate, Anchorage, for the Appellant. John J. Novak, Assistant Attorney General, Criminal Division Central Office, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

Before COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

*OPINION*

MANNHEIMER, Judge.

Keen Smith appeals the sentence he received for the crime of first-degree assault (reckless infliction of serious physical injury by means of a dangerous instrument).[1] Smith raises three primary claims in this appeal, all having to do with proposed mitigating factors.

Smith asserts that the superior court should have found his offense to be mitigated under AS 12.55.155(d)(3), the mitigator that applies to cases where the defendant's conduct was significantly affected by "some degree of duress, coercion, threat, or compulsion".

Smith also asserts that the superior court should have found his offense to be mitigated by the non-statutory mitigating factor that this Court first recognized in *Smith v. State*, 711 P.2d 561, 571–72 (Alaska App.1985)—the mitigating factor of extraordinary potential for rehabilitation.

Finally, Smith argues that this Court should recognize a new non-statutory mitigator—a mitigator that Smith calls "developmental immaturity". This proposed mitigator would apply to adolescent defendants whose criminal behavior can be attributed to the fact that adolescents' brains are not fully developed, and that they therefore lack the degree of understanding and impulse control that an adult would have.

For the reasons explained in this opinion, we conclude that the superior court correctly rejected proposed mitigator (d)(3). However, with respect to the non-statutory mitigator of extraordinary potential for rehabilitation, and with respect to the proposed new non-statutory mitigator of developmental immaturity, we conclude that the superior court's rulings are inadequate to allow meaningful appellate review. We therefore remand Smith's case to the superior court for further consideration of these non-statutory mitigators.

1. AS 11.41.200(a)(1).

*Underlying facts*

Smith entered a negotiated plea in this case, and the plea agreement included a provision that the case would be submitted to the sentencing court on stipulated facts. However, the parties' stipulation did not specify a particular version of the facts as being true. Rather, the parties merely stipulated that various participants and witnesses had given the police different (and sometimes irreconcilable) versions of the incident when they were interviewed during the investigation of this case. Under the terms of the parties' stipulation, these various accounts of the incident were submitted to the superior court, and the superior court was then left to sort out what had really happened.

Here is a summary of the information presented to the superior court pursuant to the parties' stipulation:

At approximately 12:30 a.m. on the night of November 1–2, 2007, Byron Rogers and Allen Odomin (two roommates who worked together at a restaurant) left work and stopped at Party Time Liquor to purchase alcoholic beverages. At the liquor store, they ran into Jonathan Odomin (Allen's brother) and Jonathan's girlfriend, Amanda Walker. Ms. Walker is the sister of Rigoberto Walker, the shooting victim in this case.

After running into each other at the liquor store, Byron Rogers, Allen Odomin, Jonathan Odomin, and Amanda Walker all went back to the apartment complex where they lived. (Rogers and Allen Odomin lived in the same complex as Jonathan and Amanda, but on a different floor.) Rigoberto Walker was, at this time, on the run from the juvenile justice system; he had taken refuge with his sister and Jonathan Odomin.

About an hour later, Jonathan Odomin knocked on the window of the apartment shared by Byron Rogers and Allen Odomin. Jonathan was bleeding from a split lip, and he reported that he had just been beaten up in the front yard of the apartment complex. Jonathan then ran upstairs to his own apartment, to tell Amanda and Rigoberto Walker what had happened.

A little later, Jonathan Odomin, his brother Allen, and Byron Rogers saw Rigoberto Walker standing across the street from the apartment complex, arguing with three juvenile males. These young men were later identified as J.T., age 14, Daniel Byrd, age 16, and the defendant in this case, Keen Smith, age 16.

Jonathan thought that the three juveniles who were arguing with Walker were the same people who beat him up. This, however, turned out to be wrong: later investigation revealed that Jonathan Odomin was beaten up by three different (and still unidentified) young men who just happened to be passing by the apartment complex. Keen Smith and his two companions did not commit this crime. However, Walker confronted Smith and his two companions under the mistaken belief that they were the ones who beat up Jonathan Odomin (his sister's boyfriend).

Smith and his companions truthfully denied that they were the ones who beat up Jonathan, but Jonathan insisted that they were his attackers, and Walker backed him up. Smith and his companions started to walk away, down an alley, but Walker (who apparently was intoxicated) followed the three young men and challenged them to fight. Within a few seconds, Smith pulled out a revolver and handed it to Daniel Byrd (one of his companions).

According to Byrd and J.T. (the third companion), Smith encouraged Byrd to shoot Walker. Smith, however, repeatedly denied this. According to Smith, he handed the gun to Byrd because Smith thought he was about to engage in a fist fight with Walker, and he did not wish to be carrying a loaded gun in his waistband when he did so. Smith later declared that he was taken by surprise when Byrd used the gun to shoot Walker.

In any event, whether or not Smith encouraged Byrd to shoot, it is clear that *Walker himself* was encouraging Byrd to shoot. In Walker's later statement to the police, he acknowledged that he told Byrd, "You can fire right now." J.T. confirmed that Walker told them, "Shoot me."

Moreover, according to the statements given by Byrd and Smith, Walker was actually taunting them to shoot. Smith told the police that Walker was saying, "I'll take all three of you at the same time. You['re] all some bitches. You['re] all some bitches. Shoot me! Shoot me!" And Byrd told the police that Walker said to him, "Shoot me, shoot me! Hurry up, nigger. Don't be a bitch." (Walker, Bird, Smith, and J.T. all are black.)

After Walker taunted Byrd to shoot, Byrd closed his eyes and pulled the trigger—and Walker was wounded. Smith, Byrd, and J.T. then ran away and hid the gun.

Later, J.T. led the police to the place where they had thrown away the gun, and the police retrieved the weapon. (It was a .38 special.)

Both Smith and Byrd (who, as explained above, were 16 years old at the time) were indicted as adults for attempted murder, first-degree assault (because Walker was seriously wounded), and tampering with physical evidence (for throwing the revolver away).

Approximately six months later, Smith reached a plea agreement with the State. Under the terms of this agreement, Smith pleaded guilty (as an adult) to first-degree assault, with open sentencing within the applicable presumptive sentencing rules, and the other criminal charges were dismissed.

Superior Court Judge Patrick J. McKay ruled that Smith's sentencing was governed by AS 12.55.125(c)(2), the provision that governs first felony offenders convicted of class A felonies when the defendant either used a dangerous instrument or inflicted serious physical injury on the victim. Under this statute, Smith faced a presumptive range of 7 to 11 years' imprisonment.

Judge McKay rejected the State's proposed aggravators and also rejected Smith's proposed mitigators. The judge then imposed a sentence toward the lower end of the presumptive range: 10 years with 3 years suspended (*i.e.*, 7 years to serve).

*Why we affirm the superior court's*
*rejection of proposed mitigator*
*(d)(3)*

Before we discuss Smith's proposed non-statutory mitigating factors, we first ad-

dress the question of whether the superior court should have found mitigator (d)(3)— because, if the superior court should have found mitigator (d)(3), then the question of non-statutory mitigators might well be moot.

As we noted earlier, mitigator (d)(3) applies to cases where the defendant's criminal conduct was significantly affected by "some degree of duress, coercion, threat, or compulsion". Smith argues that mitigator (d)(3) applies to his case because Walker provoked the assault. Here is the factual basis for Smith's claim, as set forth in his brief:

> By all accounts, [Walker] was intoxicated and pick[ed] a fight with Smith and his two companions.... Byron Rogers told the police that [Walker] said [to him] that he was going to get the three [young men]. [Walker] kept trying to pick a fight with Smith and his companions[,] and [even though] they walked away, [Walker] followed them. [Walker] would not leave the three juveniles alone[,] and [he] insisted on fighting them because [he] falsely believed that the juveniles [had] assaulted [his sister's boyfriend,] Jonathan Odomin.

Based on these facts, Smith argues that he acted under some degree of duress, compulsion, or threat.

We conclude that mitigator (d)(3) does not apply to these facts. Even though Smith wishes to categorize these facts as giving rise to "duress", "compulsion", or "threat", Smith's claim is more properly viewed as a claim of provocation.

Smith does not allege that Walker actually threatened him or his two companions, or that Walker displayed a weapon or otherwise suggested that he was armed. Rather, Smith alleges only that Walker kept challenging Smith and his companions to fight, and that Walker continued to follow them (and to challenge them to fight) when they tried to walk away. Even when Smith took out the revolver and handed it to Byrd, Walker took no defensive action. Instead, Walker challenged Byrd to shoot him. This is why Judge McKay (in his sentencing remarks) declared that this case did not present an instance of "imperfect self-defense".

Nor do these facts establish duress, compulsion, or threat—at least, not as those terms are commonly understood. At best, these facts establish provocation. And because Smith's claim really rests on provocation, mitigator (d)(3) does not apply. Instead, the legislature enacted two other mitigators—mitigators (d)(6) and (d)(7)—to cover claims of provocation.

■ Mitigator (d)(6) applies when a felony defendant is being sentenced for "assault under AS 11.41.200–11.41.220"—in other words, when a defendant is being sentenced for first-, second-, or third-degree assault. In sentencings for these three degrees of felony assault, the offense is mitigated if "the defendant acted with serious provocation from the victim".

As used in mitigator (d)(6), the phrase "serious provocation" is a term of art. AS 12.55.155(h) declares that, for purposes of applying mitigator (d)(6), sentencing courts are to use the definition of "serious provocation" found in Alaska's heat of passion statute, AS 11.41.115. The heat of passion statute defines "serious provocation" as "conduct ... sufficient to excite an intense passion in a reasonable person in the defendant's situation, other than a person who is intoxicated, under the circumstances as the defendant reasonably believed them to be". AS 11.41.115(f)(2).

Putting all of this together, mitigator (d)(6) codifies the rule that when a defendant is sentenced for felony assault (assault in the first, second, or third degree), the offense will be mitigated if the defendant proves that they were subjected to the same amount or degree of provocation that would reduce a murder to manslaughter under the heat of passion statute, AS 11.41.115.

■ In contrast, mitigator (d)(7) applies when a defendant is being sentenced for any felony "except ... a crime defined by AS 11.41.410–11.41.470"—in other words, for any felony other than a sexual felony. In sentencings for these non-sexual felonies, the offense is mitigated if "the victim provoked the crime to a significant degree".

The Alaska criminal code does not expressly define what constitutes "significant provo-

cation" for purposes of mitigator (d)(7). However, in *Roark v. State,* 758 P.2d 644, 646–47 (Alaska App.1988), this Court suggested that the concept of "significant provocation" was intended to encompass a greater range of provocation than the "serious provocation" required by mitigator (d)(6).

In sum, mitigator (d)(6) requires proof of "serious provocation" (a more restrictive standard than "significant provocation") in cases where a defendant is being sentenced for the three degrees of felony assault defined in AS 11.41.200, 210, and 220. In contrast, mitigator (d)(7) (with its less restrictive standard of provocation) applies to all other felonies—except for sexual assaults ("a crime defined by AS 11.41.410–11.41.470"), where no claim of provocation is allowed.

We acknowledge that, if one were to read the language of mitigator (d)(7) literally, this mitigator would apply to all defendants being sentenced for any felony other than a sexual felony—including defendants who are being sentenced for first-, second-, and third-degree assault. In other words, mitigator (d)(7), with its lower standard of provocation, would completely overlap with mitigator (d)(6), which requires proof of a higher standard of provocation for defendants convicted of first-, second-, or third-degree assault.

If we interpreted mitigator (d)(7) in this expansive fashion, it would essentially nullify mitigator (d)(6). There would never be a need for a defendant to prove, or a sentencing judge to find, the "serious provocation" required by mitigator (d)(6) if the less restrictive "significant provocation" required by mitigator (d)(7) was all that was needed to mitigate the defendant's crime.

Such a broad interpretation of mitigator (d)(7) would violate "one of the primary rules of statutory construction: that a court should assume that the legislature did not enact redundant or useless statutes."[2] As both this Court and the Alaska Supreme Court

have noted, "[o]ne of the prime directives of statutory construction is to avoid interpretations that render parts of a statute inoperative or superfluous, void or insignificant." *Champion v. State,* 908 P.2d 454, 464 (Alaska App.1995), quoting *22,757 Square Feet, More or Less v. State,* 799 P.2d 777, 779 (Alaska 1990).

Moreover, if this Court interpreted mitigator (d)(7) to apply to the three degrees of felony assault specified in mitigator (d)(6), we would violate "the basic principle of statutory construction favoring a specific provision of a statute over a general one when the two conflict." *McGee v. State,* 162 P.3d 1251, 1255 (Alaska 2007).[3]

For these reasons, we conclude that mitigator (d)(7) does not apply to defendants who are being sentenced for felony assault under AS 11.41.200–220. Instead, mitigator (d)(6) defines the standard of provocation that, if proved, will mitigate these felony assaults, and mitigator (d)(7) defines the lesser standard of provocation that applies to all other felonies (except sexual felonies, which are not mitigated by provocation).

We now turn to the question of whether mitigator (d)(3) can be employed as a vehicle for raising a claim of provocation.

Mitigator (d)(3) applies to cases where "the defendant committed the offense under some degree of duress, coercion, threat, or compulsion insufficient to constitute a complete defense, but that significantly affected the defendant's conduct".

■ Obviously, Walker's action of challenging Smith and his companions to fight did not give rise to "duress" as that term is normally understood in the criminal law. As defined in AS 11.81.440(a), the defense of "duress" applies to situations where "the defendant was coerced to [engage in criminal conduct] by the use of unlawful force upon the defendant or a third person, which force a reasonable person in the defendant's situa-

---

**2.** *Carpentino v. State,* 42 P.3d 1137, 1142 (Alaska App.2002).

**3.** Citing *Allen v. Alaska Oil & Gas Conservation Commission,* 147 P.3d 664, 668 (Alaska 2006) ("In general, if two statutes conflict, ... the specific controls over the general."). *See also*

*Petrolane, Inc. v. Robles,* 154 P.3d 1014, 1034 (Alaska 2007), quoting *City of Cordova v. Medicaid Rate Commission,* 789 P.2d 346, 352 (Alaska 1990) ("It is a maxim of construction that specific statutes should be given precedence over more general ones.").

tion would have been unable to resist." In other words, the defense of "duress" defined in AS 11.81.440(a) does not refer to situations where a person commits a crime because of overmastering emotion.

But in *Bell v. State*, 658 P.2d 787 (Alaska App.1983), this Court held that even though the word "duress", standing alone, might refer only to instances where the defendant is subjected to actual or threatened unlawful force, the complete phrase "duress, coercion, threat, or compulsion" has a broader scope. 658 P.2d at 790–91. We noted that mitigator (d)(3) does not require proof of a *valid* defense of duress or compulsion. To the contrary: the mitigator expressly applies to types of duress, coercion, threat, or compulsion that are "insufficient to constitute a complete defense, but which significantly affected [the defendant's] conduct". *Id.* at 790.

More particularly, we held in *Bell* that the phrasing of mitigator (d)(3) was broad enough to encompass a situation where a prisoner escaped from a correctional facility because he felt compelled to take immediate action to deal with a sudden family emergency. *Id.* at 791.

■ One might argue, based on *Bell*, that the term "compulsion" is potentially broad enough to encompass situations where a defendant commits an assault while in the grip of overmastering emotion, as Smith appears to suggest here. But in mitigator (d)(3), the word "compulsion" does not appear by itself. Rather, it is one component of the phrase, "duress, coercion, threat, or compulsion". Under the principle of *noscitur a sociis*, we are to construe the word "compulsion" in light of the other three words in this phrase: "duress, coercion, [or] threat".[4]

This principle of statutory construction suggests that the term "compulsion" should be not be interpreted to include overmastering emotion or passion of the type Smith proposes. And, indeed, in *Lee v. State*, 673 P.2d 892 (Alaska App.1983), this Court rejected the argument that mitigator (d)(3) applied to crimes stemming from purely emotional "compulsion".

The defendant in *Lee* was convicted of first-degree assault for shooting and severely wounding a police officer who arrived at Lee's home to investigate the neighbors' report of a disturbance.[5] Lee argued that mitigator (d)(3) applied to his offense because he was under emotional stress at the time of the offense and had acted out of "internal compulsion". In support of this argument, Lee relied on his troubled financial and domestic situations, his intoxication at the time of the shooting, and expert testimony indicating that he had an impulsive personality and was easily provoked.[6]

This Court acknowledged that, in *Bell*, we construed mitigator (d)(3) as applying to a type of "compulsion" that was internal (as opposed to a compulsion arising from the coercive or threatening actions of other people).[7] But we noted that our decision in *Bell* dealt with "an offense committed under a good faith but unreasonable belief by the defendant that his conduct was necessary".[8] We then declared:

> Nothing in *Bell* indicated that the scope of [mitigator] (d)(3) is sufficiently broad to encompass behavior that is merely impulsive or the result of situational stress. Lee's reliance on this mitigating factor was based exclusively on a showing of impulsive character and financial and emotional stress. Lee did not present any evidence indicating that he acted out of a mistaken belief that his conduct was necessary. We therefore conclude that there is insufficient evidence in the record to support a finding that Lee's conduct was the result of inter-

---

**4.** *Noscitur a sociis*—literally, "it is known by its associates"—is the principle of statutory construction which directs a court to construe an unclear or ambiguous word or phrase in light of the words immediately surrounding it. *See* Garner, *Black's Law Dictionary* (8th ed.2004), p. 1087; *Morgan v. State*, 139 P.3d 1272, 1277 n. 8 (Alaska App.2006).

**5.** *Lee*, 673 P.2d at 893.

**6.** *Id.* at 896.

**7.** *Id.*

**8.** *Id.*, citing *Bell*, 658 P.2d at 791.

nal compulsion within the meaning of [mitigator (d)(3) ].

*Lee*, 673 P.2d at 896.

This Court's holding in *Lee*—that mitigator (d)(3) does not encompass the type of mental or emotional "compulsion" that arises purely from situational stress or from a defendant's impulsiveness—leads us to conclude that Smith is not entitled to rely on mitigator (d)(3) under the facts of this case.

Smith was convicted of first-degree assault for soliciting or encouraging his companion, Byrd, to shoot Walker. The only "compulsion" that prompted Smith to hand the revolver to Byrd, and to then solicit or encourage Byrd to shoot Walker, was the fact that Walker openly challenged Smith and Byrd to fight him—and the fact that, when Byrd had the gun in his hand, Walker challenged Byrd to shoot him and suggested that Smith and Byrd would be cowards if they did not shoot.

These facts do not fall within the definition of "compulsion". Rather, they fall within the definition of "provocation". And if we were to interpret mitigator (d)(3) to cover this dubious form of provocation, there would never be a need for a defendant to prove, or a sentencing judge to find, the "serious" provocation required by mitigator (d)(6) or the "significant" provocation required by mitigator (d)(7).

In other words, if this Court adopted Smith's suggestion that mitigator (d)(3) should apply to cases where a defendant commits a crime in response to a provocation that would not be enough to satisfy mitigator (d)(6) or mitigator (d)(7) (whichever one applied), we would render mitigators (d)(6) and (d)(7) redundant or useless in all cases where a defendant claims that their offense was mitigated by provocation.

The rules of statutory construction counsel against this course. As we noted earlier, "[o]ne of the prime directives of statutory construction is to avoid interpretations that render parts of a statute inoperative or superfluous, void or insignificant." *Champion*, 908 P.2d at 464.

For these reasons, we conclude that mitigator (d)(3) does not apply to Smith's case. Accordingly, we affirm the superior court's rejection of this mitigator.

### *The proposed non-statutory mitigator of "extraordinary potential for rehabilitation"*

■ In addition to proposing mitigator (d)(3), Smith argued that two non-statutory mitigators applied to his case, and that therefore his case should be forwarded to the statewide three-judge sentencing panel (which is the only court authorized to consider non-statutory mitigators).[9]

The first of Smith's two non-statutory mitigators was "extraordinary potential for rehabilitation".[10]

Smith's attorney presented substantial evidence that Smith's criminal behavior arose from family stresses, from peer-group pressure, and from general teenage immaturity. (As we noted earlier, Smith was 16 years old at the time of this offense.)

The chief defense witness on this issue was Dr. Nan Truitt, a clinical psychologist who had worked both at McLaughlin Youth Center and in the adolescent unit at Alaska Psychiatric Institute. Truitt described many factors that pointed toward Smith's successful rehabilitation, and she concluded that Smith had much better chances than the majority of the children whom she had evaluated in her years working with troubled youths. She told the court that she believed, to "a reasonable degree of psychological and scientific certainty", that Smith had an extraordinary potential for rehabilitation, and that he was not likely to re-offend.

Truitt acknowledged that she, herself, had diagnosed Smith as being on the borderline between "oppositional defiant disorder" and a full-blown "conduct disorder".

(Conduct disorder is the worse category: according to the DSM–IV, the essential feature of a diagnosis of "conduct disorder" is "a repetitive and persistent pattern of behavior in which the basic rights of others or major

---

**9.** *See* AS 12.55.165–175.

**10.** *See Smith v. State*, 711 P.2d 561, 571–72 (Alaska App.1985).

age-appropriate societal norms or rules are violated".)

However, Truitt pointed out that, even if Smith should be classified as having a "conduct disorder", his condition was "adolescent onset"—which was a hopeful sign. According to Truitt, a majority of adolescents with this diagnosis "go on [to] life as a pretty typical adult".

We do not wish to suggest that Truitt's testimony came in unchallenged. The prosecutor conducted a detailed and probing cross-examination of Truitt, pointing out that there were other ways to interpret Smith's conduct, and other ways to interpret Smith's performance on the psychological tests. The prosecutor also pointed out that Smith might have lied to Truitt when he described the shooting and his reaction to it. However, the State presented no competing testimony concerning Smith's potential for rehabilitation.

This Court has stated that, when a defendant asserts the non-statutory mitigator of "extraordinary potential for rehabilitation", the defendant must prove by clear and convincing evidence that they "can adequately be treated in the community and need not be incarcerated for the full presumptive term in order to prevent future criminal activity." *Beltz v. State*, 980 P.2d 474, 481 (Alaska App.1999), quoting *Lepley v. State*, 807 P.2d 1095, 1100 (Alaska App.1991). We also clarified:

> Such a prediction of successful treatment and non-recidivism should only be made when the sentencing court is reasonably satisfied both that it knows why a particular crime was committed and that the conditions leading to the criminal act will not recur—either because the factors that led the defendant to commit the crime are readily correctable or because the defendant's criminal conduct resulted from unusual environmental stresses unlikely to recur.

*Beltz*, 980 P.2d at 481. These, then, were the legal considerations that Judge McKay was supposed to weigh or resolve when he ruled on Smith's proposed non-statutory mitigator.

Moreover, as we explained earlier, even though the parties submitted this case to the superior court on stipulated facts, the parties' stipulation did not identify a particular version of events as being true. Rather, the parties only stipulated that various witnesses told the police various things. Thus, the parties' stipulation left certain important factual disputes unresolved.

One crucial unresolved issue of fact was Smith's state of mind—in particular, his purpose or intention when he handed the revolver to his companion, Daniel Byrd. As we noted earlier, both Byrd and Smith's other companion, J.T., told the police that Smith openly urged Byrd to shoot Walker. Smith, on the other hand, contended that he handed the gun to Byrd to get rid of it, so that he would not be carrying a loaded firearm when he engaged in a fist fight with Walker (as Walker was challenging him to do).

Judge McKay ruled against Smith on this proposed mitigator, but his ruling is so terse that it does not allow meaningful appellate review. Judge McKay did not make any factual findings regarding Dr. Truitt's testimony, or regarding the question of Smith's intent when he handed the gun to Byrd, or with regard to any of the other factual assertions that the defense attorney relied on when the attorney argued for this mitigating factor. Further, Judge McKay failed to discuss any of our cases defining this non-statutory mitigator, nor did he offer any other indication of *why* he thought that Smith's proof did not meet the standard set forth in those cases. Here is the complete text of Judge McKay's ruling:

> *The Court:* I ... very reluctantly do not find an extraordinary chance of rehabilitation with Mr. Smith. Mr. Smith, you have [a] good chance of rehabilitation, ... [and] that, by far, is my highest *Chaney* criteri[on] in sentencing you. You just don't rise to that extraordinary level of rehabilitation.... It's a very, very high standard to meet, and you're just not there. But ... you have a very good chance of rehabilitation. This Court fully expects not to see you [again] after you've completed [the sentence that] you need to complete here.

As can be seen, Judge McKay declared that he did *not* expect Smith to engage in future criminal behavior. Nevertheless,

Judge McKay rejected the proposed mitigator.

Judge McKay's ruling gives essentially no insight into what testimony the judge found to be credible, or what factual assertions he found to be true, or how he assessed the evidence in light of the legal test set forth in our cases on this subject. For these reasons, we must remand Smith's case to the superior court and direct Judge McKay to clarify his decision.

### The proposed non-statutory mitigator of "developmental immaturity"

Smith also proposed a new, previously unrecognized non-statutory mitigator, which he called "developmental immaturity". The gist of this proposed new non-statutory mitigator is that teenagers are not as culpable as adults: they do not yet have the cognitive faculties and judgement of adults, because their brains are still developing and their frontal lobes have not yet physically matured. According to Smith, because teenagers do not have fully developed brains, they are less able than adults to understand or appreciate their actions, to control their impulses, or to foresee the consequences of their actions.

This is the same rationale that the United States Supreme Court relied on in *Roper v. Simmons*, 543 U.S. 551, 569–570, 125 S.Ct. 1183, 1195–96, 161 L.Ed.2d 1 (2005), when the Supreme Court held that it was unconstitutional to impose the death penalty on a juvenile.

In essence, Smith is arguing that even though the Alaska legislature has declared that teenagers as young as 16 can be prosecuted and convicted as adults for serious felonies,[11] these young teenagers should presumptively be entitled to some leniency (in the form of a non-statutory mitigator) when it comes to sentencing.

In support of this proposed mitigator, Smith presented the superior court with the *amicus curiae* brief filed by the American Medical Association and the American Psychiatric Association (among others) in *Roper v. Simmons*. Smith also provided the superior court with the special sentencing recommendations formulated by the American Bar Association for adolescent offenders.

(The State's sentencing memorandum did not address these matters.)

At Smith's sentencing hearing, two expert witnesses testified in support of this proposed non-statutory mitigator.

Dr. Ronald Roesch, a forensic psychologist and professor of psychology at Simon Fraser University, testified that adolescents who commit violent acts generally do not continue to commit acts of violence when they grow to adulthood. According to Roesch, the recidivism rate for juveniles (among a group who were tracked until the age of 25) is approximately 20 percent. Roesch asserted that the explanation for this low recidivism rate is that youthful acts of violence tend to arise from adolescents' difficulties in controlling their impulses, in paying heed to the long-term consequences of their actions, and in rejecting the influence of their peers. Roesch testified that, when adolescents grow into adulthood, they "get more sober" and "maybe take fewer risks" and "make better decisions".

Dr. Roesch described the research into human development that the Supreme Court relied on in *Roper v. Simmons:* the findings "that adolescents are in fact different [from adults]". According to Roesch, adolescents are "over-represented, statistically, in virtually every category of reckless behavior", but this reckless behavior is "transient": as they mature, their recklessness subsides. Roesch told the superior court:

> [A]dolescence is a time of change, [and] there's a potential for change. They don't make decisions as well as adults, but they're capable of doing [better] as they mature and as they learn better problem-solving skills.

Dr. Nan Truitt (who mainly testified about Smith's potential for rehabilitation) supported Dr. Roesch's testimony on the developmental deficits of adolescents in general.

As we have already noted, Truitt is a clinical psychologist with post-doctoral training in neuropsychology. She worked at

---

11. *See* AS 47.12.030(a).

McLaughlin Youth Center for two years, and then in the adolescent unit of Alaska Psychiatric Institute. Truitt corroborated Roesch's testimony that the brains of juveniles are less than fully developed—and that, for this reason, they do not have an adult capacity to understand and appreciate the situations they confront, or the consequences of their conduct. With particular reference to this case, Truitt testified that Smith reacted emotionally, rather than soberly, to the confrontation with Walker because his frontal lobe was not fully developed.

Despite the extensive discussion of this issue in the pre-sentence memoranda, and despite the expert testimony presented in support of this proposed non-statutory mitigator at the sentencing hearing, Judge McKay's ruling on this proposed mitigator was terse and explained little of his analysis or reasoning. Here is the complete text of Judge McKay's ruling:

> *The Court:* [A]s horrendous as [life] is at 16 years [of age]—we're not able to control some of our reactions, [and] we do maybe have a hot cognition, and ... we're not able to make good snap judgments—it doesn't rise to ... the level of a mental disease or defect.

Again, Judge McKay's ruling provides little insight into what testimony the judge found to be credible or what factual assertions he found to be true. It appears, from the judge's remarks, that he credited at least some of the evidence that Smith offered in support of the proposed mitigator, and that he agreed with Smith that teenagers have a reduced capacity to "control [their] reactions" and to exercise good judgement in the heat of the moment.

If Judge McKay did, in fact, agree with Smith's contention that teenagers have a reduced capacity for judgement, foresight, and self-control, then the fact that this reduced capacity might not amount to a "mental disease or defect" does not necessarily mean that courts should reject any notion of a non-statutory mitigator based on these deficiencies.

In *Smith*, where this Court first recognized the non-statutory mitigator of extraordinary potential for rehabilitation, part of this Court's rationale was that the proposed mitigator was intimately related to the statutory sentencing goal of rehabilitating offenders. *See* AS 12.55.005(2); *Smith*, 711 P.2d at 570–72.

In the present case, it appears that Smith's proposed non-statutory mitigator of developmental immaturity is potentially related to the legislature's overarching goal of eliminating unjustified disparity in sentencing—as codified in the legislature's directives to sentencing judges to assess the relative seriousness of the defendant's offense in relation to other offenses, and to assess the degree to which the defendant's conduct is deserving of community condemnation. *See* AS 12.55.005(1) and (6).

Moreover, the legislature has already adopted an apparent counterpart to Smith's proposed non-statutory mitigator—a mitigator that applies to the mental disabilities of the elderly. AS 12.55.155(d)(5) creates a mitigator for cases where "the conduct of an aged defendant was substantially a product of ... mental infirmities resulting from the defendant's age". In other words, the legislature has already recognized that the seriousness or blameworthiness of a felony can be mitigated by a defendant's mental infirmities, even when those infirmities do not necessarily amount to a "mental disease or defect".

For these reasons, we again conclude that we must remand Smith's case to the superior court so that Judge McKay can clarify his decision on this proposed new mitigator.

*Conclusion*

For the reasons explained here, we conclude that mitigator (d)(3) does not apply to the facts of Smith's case, and we therefore AFFIRM the superior court's ruling on this mitigator. However, with respect to the superior court's rulings on Smith's two proposed non-statutory mitigators, we VACATE the superior court's decisions, and we direct the superior court to reconsider these issues.

To the extent that the superior court concludes that its reconsideration of these matters requires the court to resolve disputed issues of fact, the court is authorized to take

testimony or otherwise receive evidence pertinent to these issues of fact.

The superior court shall issue its rulings on the two non-statutory mitigators within 90 days of the date of this opinion. After the superior court issues its rulings, the parties shall have 30 days to file memoranda in response to the superior court's decision. After this Court has received the parties' memoranda (or the time for filing those memoranda has expired), this Court will resume its consideration of the two non-statutory mitigators.