Keen SMITH, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10512.

Court of Appeals of Alaska.

July 1, 2011.

Leslie Dickson, Assistant Public Advocate, and Rachel Levitt, Public Advocate, Anchorage, for the Appellant.

Eric A. Ringsmuth, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

*OPINION*

MANNHEIMER, Judge.

Keen Smith appeals the sentence he received for the crime of first-degree assault (reckless infliction of serious physical injury by means of a dangerous instrument).[1] At his sentencing, Smith asked the sentencing judge to refer his case to the three-judge statewide sentencing panel—the panel of the superior court that is authorized to depart from the normal rules that govern presumptive sentencing.[2]

As a basis for sending his case to the three-judge panel, Smith relied on two proposed non-statutory mitigators—*i.e.*, two proposed mitigating factors that are not listed in AS 12.55.155(d). First, Smith argued that the superior court should find his offense to be mitigated by the non-statutory mitigating factor that this Court first recognized in *Smith v. State*, 711 P.2d 561, 571–72 (Alaska App.1985)—the mitigating factor of extraordinary potential for rehabilitation. Second, Smith argued that the superior court should recognize a new non-statutory mitigator—a mitigator that Smith called "developmental immaturity". This proposed mitigator would apply to adolescent defendants whose criminal behavior was attributable to the fact that adolescents' brains are not fully developed, and that they therefore lack the degree of judgement and impulse control that a typical adult would have.

In our first decision in this case, *Smith v. State*, 229 P.3d 221 (Alaska App.2010), we remanded Smith's case to the superior court for reconsideration of these two proposed non-statutory mitigators. The superior court again rejected both of Smith's proposed mitigators. The superior court concluded that Smith failed to prove that he had extraordi-

1. AS 11.41.200(a)(1).

2. *See* AS 12.55.175.

nary prospects for rehabilitation, and the superior court rejected Smith's other proposed mitigator, "developmental immaturity", because the court concluded that this proposed mitigator was encompassed within the already-recognized mitigator of extraordinary potential for rehabilitation.

For the reasons explained in this opinion, we affirm the superior court's decision with respect to both of the proposed mitigators.

### Underlying facts

Smith entered a negotiated plea in this case, and the plea agreement included a provision that the case would be submitted to the sentencing court on stipulated facts. However, the parties' stipulation did not specify a particular version of the facts as being true. Rather, the parties merely stipulated that various participants and witnesses had given the police different (and sometimes irreconcilable) versions of the incident when they were interviewed during the investigation of this case. Under the terms of the parties' stipulation, these various accounts of the incident were submitted to the superior court, and the superior court was then left to sort out what had really happened.

Here is a summary of the information presented to the superior court pursuant to the parties' stipulation:

At approximately 12:30 a.m. on the night of November 1–2, 2007, Byron Rogers and Allen Odomin (two roommates who worked together at a restaurant) left work and stopped at Party Time Liquor to purchase alcoholic beverages. At the liquor store, they ran into Jonathan Odomin (Allen's brother) and Jonathan's girlfriend, Amanda Walker. Amanda Walker is the sister of Rigoberto Walker, the shooting victim in this case.

After running into each other at the liquor store, the four youths all went back to the apartment complex where they lived. (Rogers and Allen Odomin lived in the same complex as Jonathan Odomin and Amanda, but on a different floor.) Rigoberto Walker was, at this time, on the run from the juvenile justice system; he had taken refuge with his sister Amanda and her boyfriend Jonathan.

About an hour later, Jonathan Odomin knocked on the window of the apartment shared by Byron Rogers and Allen Odomin. Jonathan was bleeding from a split lip, and he reported that he had just been beaten up in the front yard of the apartment complex. Jonathan then ran upstairs to his own apartment, to tell Amanda and her brother Rigoberto what had happened.

A little later, Jonathan Odomin, his brother Allen, and Byron Rogers saw Rigoberto Walker standing across the street from the apartment complex, arguing with three juvenile males. These three juvenile males were later identified as J.T., age 14, Daniel Byrd, age 16, and the defendant in this case, Keen Smith, age 16.

Jonathan mistakenly thought that the three juveniles who were arguing with Rigoberto were the same people who beat him up. (Subsequent investigation revealed that Jonathan Odomin was beaten up by three different (and still unidentified) young men who just happened to be passing by the apartment complex.) In other words, Keen Smith and his two companions had not committed this earlier crime, but Rigoberto Walker confronted them under the mistaken belief that they were the ones who beat up his sister's boyfriend, Jonathan.

Smith and his companions denied (i.e., they truthfully denied) that they were the ones who beat up Jonathan, but when Jonathan insisted that they were his attackers, Walker backed him up. Smith and his companions started to walk away, down an alley, but Walker (who apparently was intoxicated) followed the three young men and challenged them to fight. Within a few seconds, Smith pulled out a revolver and handed it to Daniel Byrd.

According to Byrd and J.T. (the third companion), Smith encouraged Byrd to shoot Walker. Smith, however, repeatedly denied this when he was later interviewed. According to Smith, he handed the gun to Byrd because thought he was about to engage in a fist fight with Walker, and he did not wish to be carrying a loaded gun in his waistband

when he did so. Smith declared that he was taken by surprise when Byrd used the gun to shoot Walker.

In any event, whether or not Smith encouraged Byrd to shoot, it is clear that *Walker himself* encouraged Byrd to shoot. In Walker's later statement to the police, he acknowledged that he told Byrd, "You can fire right now." And J.T. confirmed that Walker told them, "Shoot me."

Moreover, according to the statements given by Byrd and Smith, Walker was actually taunting them to shoot. Smith told the police that Walker was saying, "I'll take all three of you at the same time. You['re] all some bitches. You['re] all some bitches. Shoot me! Shoot me!" And Byrd told the police that Walker said to him, "Shoot me, shoot me! Hurry up, nigger. Don't be a bitch." (Walker, Byrd, Smith, and J.T. all are black.)

With Walker taunting Byrd to shoot, Byrd closed his eyes and pulled the trigger; Walker was hit. Smith, Byrd, and J.T. then ran away and hid the gun. Later, J.T. led the police to the place where they had thrown away the gun, and the police retrieved the weapon.

Both Smith and Byrd (who, as explained above, were 16 years old at the time) were indicted as adults for attempted murder. They were also indicted for first-degree assault (because Walker was seriously wounded), and for tampering with physical evidence (for throwing the revolver away).

Approximately six months later, Smith reached a plea agreement with the State. Under the terms of this agreement, Smith pleaded guilty (as an adult) to first-degree assault, with open sentencing within the applicable presumptive sentencing rules, and the other criminal charges were dismissed.

Superior Court Judge Patrick J. McKay ruled that Smith's sentencing was governed by AS 12.55.125(c)(2), the provision that governs first felony offenders convicted of class A felonies when the defendant either used a dangerous instrument or inflicted serious physical injury on the victim. Under this statute, Smith faced a presumptive range of 7 to 11 years' imprisonment.

Judge McKay rejected the State's proposed aggravators and also rejected Smith's proposed mitigators. The judge then imposed a sentence toward the lower end of the presumptive range: 10 years with 3 years suspended (*i.e.*, 7 years to serve).

*The proposed non-statutory mitigator of "extraordinary potential for rehabilitation"*

■ Because Smith argued that two non-statutory mitigators applied to his case, and because the statewide three-judge sentencing panel is the only sentencing court authorized to consider non-statutory mitigators, *see* AS 12.55.165–175, Smith asked his sentencing judge. to refer his case to the three-judge panel.

The first of Smith's two non-statutory mitigators was "extraordinary potential for rehabilitation".[3] In support of this proposed mitigator, Smith's attorney presented substantial evidence that Smith's criminal behavior arose from family stresses, from peer-group pressure, and from general teenage immaturity. (As we noted earlier, Smith was 16 years old at the time of this offense.)

The chief defense witness on this issue was Dr. Nan Truitt, a clinical psychologist who had worked both at McLaughlin Youth Center and at the adolescent unit at Alaska Psychiatric Institute. Truitt described many factors that pointed toward Smith's successful rehabilitation, and she concluded that Smith had much better chances than the majority of the children whom she had evaluated in her years working with troubled youths. She told the court that she believed, to "a reasonable degree of psychological and scientific certainty", that Smith had an extraordinary potential for rehabilitation, and that he was not likely to re-offend.

Truitt acknowledged that she had diagnosed Smith as being on the borderline between "oppositional defiant disorder" and a full-blown "conduct disorder". ("Conduct disorder is the worse category: according to

---

**3.** This mitigator was recognized and defined by this Court in a series of cases beginning with *Christopher Smith v. State,* 711 P.2d 561 (Alaska App.1985).

the DSM–IV, the essential feature of a diagnosis of "conduct disorder" is "a repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules are violated".)

However, Truitt pointed out that, even if Smith should be classified as having a "conduct disorder", his condition was "adolescent onset"—which was a hopeful sign. According to Truitt, a majority of adolescents with this diagnosis "go on [to] life as a pretty typical adult".

We do not wish to suggest that Truitt's testimony came in unchallenged. The prosecutor conducted a detailed and probing cross-examination of Truitt, pointing out that there were other ways to interpret Smith's conduct, and other ways to interpret Smith's performance on the psychological tests. The prosecutor also pointed out that Smith might have lied to Truitt when he described the shooting and his reaction to it. However, the State presented no competing testimony concerning Smith's potential for rehabilitation.

■■■ A defendant who asserts the non-statutory mitigator of "extraordinary potential for rehabilitation" must prove by clear and convincing evidence that they "can adequately be treated in the community and need not be incarcerated for the full presumptive term in order to prevent future criminal activity." *Beltz v. State*, 980 P.2d 474, 481 (Alaska App.1999), quoting *Lepley v. State*, 807 P.2d 1095, 1100 (Alaska App.1991). As we explained in *Beltz*:

> Such a prediction of successful treatment and non-recidivism should only be made when the sentencing court is reasonably satisfied both that it knows why a particular crime was committed and that the conditions leading to the criminal act will not recur—either because the factors that led the defendant to commit the crime are readily correctable or because the defendant's criminal conduct resulted from unusual environmental stresses unlikely ever to recur.

980 P.2d at 481. These, then, were the legal considerations that Judge McKay was to weigh or resolve when he ruled on Smith's proposed non-statutory mitigator.

In his decision on remand, Judge McKay acknowledged the scientific research on brain development—and, more specifically, the research indicating that teenagers have not achieved their full adult brain development. Judge McKay "accept[ed] the science on adolescent brain development presented by Smith", and the judge indicated that, if Smith's current crime had been an "isolated act", this scientific evidence might have led him to conclude that Smith had extraordinary prospects for rehabilitation.

However, Judge McKay concluded that Smith's case did not involve an isolated instance of anti-social behavior. As the judge noted, in the five months preceding the shooting in this case, Smith engaged in two other, separate incidents of law-breaking. In one instance, Smith and some of his friends stole speakers out of a car. Three months later, Smith and his friends threw rocks at moving vehicles (and hit a van full of people in the passenger-side window).

Judge McKay further noted that Smith had dropped out of school, he stayed at his father's home only "occasionally", he did not have a job, and he had recently been fined for operating a vehicle without possessing a driver's license or registration. Following Smith's arrest for this shooting, while he was in jail, Smith was "written up" for three infractions: fighting, disorderly conduct, and possession of contraband.

Judge McKay concluded that, although Smith was "far from being the worst juvenile offender to appear [before him]", Smith was nevertheless not a law-abiding teenager who "succumbed to adolescent impulsiveness" on an isolated occasion. Rather, Judge McKay found that Smith's history "showed a pattern of misbehavior".

Judge McKay acknowledged that, at Smith's original sentencing hearing, he (the judge) had declared that Smith had "a very good chance of rehabilitation". He stated that he still thought this was true—but he explained that Smith's "very good" chance of rehabilitation was not the same as the "extraordinary potential for rehabilitation" required to prove the non-statutory mitigator:

*The Court:* [This] Court did not, and does not, find that Smith has an "extraordinary" [potential for rehabilitation]. Under the *Beltz* standard, this Court is not reasonably satisfied that it knows why this particular crime was committed.... [J]uvenile [impulsiveness] and peer pressure could have played a significant role in the commission of the crime ..., but Smith's history prior to the shooting[,] and his conduct in jail while awaiting disposition of [this] case[,] indicate that this was not a one-time incident.

. . .

The second prong of the *Beltz* test—"that the conditions leading to the criminal act will not recur"—also [is] not satisfied in this case. [Smith] had two criminal incidents in the five months leading up to this shooting and [he] racked up three violations while incarcerated. He was apparently unresponsive to his informal [juvenile] probation. [This] Court is far from reasonably satisfied that [Smith's] "criminal conduct resulted from unusual environmental stresses unlikely ever to recur", let alone convinced by clear and convincing evidence of this unlikelihood.

In his brief to this Court, Smith asserts that Judge McKay's findings are both unsupported and internally inconsistent.

Specifically, Smith notes that Judge McKay declared that he accepted the testimony concerning adolescent brain development—in particular, the fact that adolescents do not have a fully developed ability to control their impulses, and the fact that a great majority of adolescents (approximately four out of five) who engage in unlawful behavior as teenagers do not continue to break the law when they become adults.

It is true that Judge McKay stated that he accepted the scientific evidence concerning adolescent brain development. However, as we have described, the judge also stated that he believed Smith's criminal behavior in this case was attributable, not merely to adolescent impulsiveness, but to a more persistent pattern of antisocial behavior. The judge based this conclusion on Smith's delinquent acts (apart from the shooting in this case) and Smith's inability to obey correctional facility rules following his arrest in this case.

In his brief to this Court, Smith argues that these delinquent acts and correctional facility infractions are "precisely the type of low-level adolescent conduct [that] the science on adolescent brain development explains". Thus, Smith continues, Judge McKay could not have been uncertain as to why Smith committed the assault in this case. The assault must have been due to Smith's lack of adult brain development. According to Smith, the shooting was "unforeseeable", and "there is simply no reason to assume that incarceration is necessary to prevent Smith from re-offending".

But Smith's argument is based on viewing the evidence in the light most favorable to Smith, not the light most favorable to upholding Judge McKay's findings. Judge McKay could reasonably conclude that Smith's string of antisocial behavior did not stem solely from the fact that Smith was an impulsive teenager—that there was something else at work in his personality. And, as Judge McKay remarked, the fact that eighty percent of delinquent teenagers are eventually able to conform their behavior to the requirements of the law means that twenty percent do not develop this ability.

Moreover, to the extent that Smith suggests that the shooting was completely "unforeseeable", and that he bears little fault for the shooting, this argument is foreclosed by Smith's decision to plead no contest to first-degree assault. This Court held in *Ashenfelter v. State*, 988 P.2d 120, 123 (Alaska App.1999), that after a defendant pleads guilty or no contest to a criminal charge, they are not entitled to deny their factual guilt of the charge. Even though a defendant who pleads no contest (like Smith) need not concede the factual truth of the State's allegations, the legal effect of the defendant's no contest plea is that the sentencing court is entitled to treat each element of the offense as proved (despite the defendant's protestations of factual innocence). *Scott v. State*, 928 P.2d 1234, 1238 (Alaska App.1996).

Smith pleaded no contest to first-degree assault as defined in AS 11.41.200(a)(1). In other words, he agreed that the superior

court could (for sentencing purposes) conclusively presume that Smith inflicted serious physical injury on another person by means of a dangerous instrument, and that Smith acted at least recklessly with respect to the possibility that his actions would cause this result.

In this context, "recklessly" means that Smith was aware of, and that he consciously disregarded, a substantial and unjustifiable possibility that his act of handing the loaded handgun to his companion, Byrd, would lead to the infliction of serious physical injury.[4] Thus, even though Smith may legitimately argue that he did not *intend* for another person to suffer serious physical injury, Smith is prohibited from arguing that the shooting and the resulting infliction of serious physical injury were "unforeseeable".

For these reasons, we affirm Judge McKay's decision that Smith failed to prove the non-statutory mitigator of extraordinary potential for rehabilitation.

### The proposed non-statutory mitigator of "developmental immaturity"

■ Smith also proposed a new non-statutory mitigating factor which he called "developmental immaturity". In support of this new mitigator, Smith presented testimony pertaining to scientific findings that human brain development is not complete until a person reaches their early to mid-twenties—and that adolescents lack the degree of judgement and impulse control that a typical adult would have.

In the portion of his decision addressing this proposed mitigator, Judge McKay declared that "[t]he science regarding developmental maturity is clear", and he accepted the proposition that "Smith, like most 16-year–olds, was developmentally immature at the time of the shooting".

Moreover, Judge McKay accepted the proposition that Smith's crime "was particularly influenced by impulsive behavior and peer pressure, both classic symptoms of developmental immaturity". He concluded that the shooting had been prompted by the fact that Smith and his companions "needed to

prove their toughness", and by "tension and mounting peer pressure".

Judge McKay also accepted the proposition that Smith and his companions "did not set out to commit any crimes that evening", and that the shooting was "a classic example of impulsive behavior", with "little time for rational thought or introspection".

However, Judge McKay declared that he considered all of this information when he evaluated Smith's other proposed mitigator—*i.e.*, when he decided whether Smith had an extraordinary potential for rehabilitation. Judge McKay concluded that the information about human brain development was "simply part and parcel of this [already] established mitigator."

The judge acknowledged that his findings—that Smith acted impulsively, and that his conduct was shaped by peer pressure—seemingly supported a finding that Smith had an extraordinary potential for rehabilitation. However, the judge explained that Smith's developmental immaturity was "simply one factor in evaluating [his] potential for rehabilitation":

> *The Court:* An offender's youthful age has always been a factor that a sentencing court takes into consideration. Neuroscience has now [given] us [a further justification for] this [practice]. Smith, though, present[s] a pattern of bad decisions.... [Developmental immaturity] is certainly a factor in Smith's sentencing, but that factor is outweighed by the totality of the circumstances both before and after Smith pulled a revolver out of his waistband....

In his brief to this Court, Smith argues that Judge McKay mistakenly treated "developmental immaturity" as merely a component of the already recognized mitigating factor of "extraordinary potential for rehabilitation". Smith argues that an adolescent's developmental immaturity must be viewed as an independent mitigating factor, apart from the adolescent's prospects for rehabilitation.

Smith places primary reliance on the United States Supreme Court's decisions in *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183,

4. *See* AS 11.81.900(a)(3) (defining "recklessly").

161 L.Ed.2d 1 (2005), and *Graham v. Florida,* — U.S. —, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). In *Simmons,* the Supreme Court held that the cruel and unusual punishment clause of the Eighth Amendment prohibits the states from imposing the death penalty on juveniles. 543 U.S. at 568, 125 S.Ct. at 1194. In *Graham,* the Supreme Court held that this clause of the Eighth Amendment prohibits the states from sentencing juveniles to life imprisonment without possibility of parole for non-homicide offenses. 130 S.Ct. at 2030.

The decisions in *Simmons* and *Graham* are based on the conclusion that juveniles (as a group) are "less deserving of the most severe punishments" because, compared to adults, they exhibit a "lack of maturity and an underdeveloped sense of responsibility", because they are "more vulnerable or susceptible to negative influences and ... peer pressure", and because their characters are "not as well formed". *Graham,* 130 S.Ct. at 2026, citing *Simmons,* 543 U.S. at 569–570, 125 S.Ct. at 1195.

Smith argues that, because of these differences between juveniles and adults, because juveniles "cannot conceptualize long-term consequences" and because their conduct is characterized by a "corresponding impulsivity", this Court should recognize a special "developmental immaturity" mitigating factor that would apply to offenders in their teens and early twenties—a mitigating factor distinct from the already recognized mitigator for extraordinary prospects for rehabilitation.

We reject this proposed mitigating factor for two reasons.

First, although the decisions in *Simmons* and *Graham* are premised on the recognition that juveniles are less mature and hence less blameworthy than adults, *Simmons* and *Graham* impose fairly narrow restrictions on a state's sentencing authority over juvenile offenders. *Simmons* holds that the Constitution forbids the states from sentencing juveniles to death, and *Graham* holds that the Constitution forbids the states from sentencing juveniles to life imprisonment without possibility of parole unless the juvenile has been convicted of a homicide. But the Su-

preme Court said nothing to suggest that the Constitution might call for across-the-board mitigation of all other criminal penalties when the offender is a juvenile. Nor does the Court's reasoning in *Simmons* and *Graham* lead to such a conclusion.

The constitutional evil that the Supreme Court identified in *Simmons* and *Graham* is the imposition of a sentence that "alters the offender's life by a forfeiture that is irrevocable"—a penalty that permanently removes a juvenile offender from society, and that can never be modified (absent executive clemency) even if the juvenile offender later matures and demonstrates the capacity to pursue a productive and law-abiding life. *Graham,* 130 S.Ct. at 2027. However, *Simmons* and *Graham* do not purport to limit the imposition of lesser penalties on juvenile offenders. In fact, the *Graham* decision holds that it *is* constitutionally permissible to impose a life sentence on a juvenile (even for a non-homicide offense), and to potentially make the juvenile spend their remaining life in prison, so long as there is an institutionalized legal mechanism available to modify the sentence if the juvenile demonstrates their rehabilitation:

> The Eighth Amendment does not foreclose the possibility that persons convicted of non[-]homicide crimes committed before adulthood will remain behind bars for life. It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society.

For these reasons, we conclude that the holdings and the reasoning of *Simmons* and *Graham* do not support an across-the-board mitigation of sentences for juvenile offenders who are prosecuted within the adult justice system.

Second, Smith's proposal that this Court recognize a mitigating factor for "developmental immaturity" appears to contravene the policy underlying the legislature's creation of aggravating and mitigating factors.

As this Court explained in *Knight v. State,* 855 P.2d 1347, 1349 (Alaska App.1993), the presumptive sentencing range for any given class of case "represents the appropriate sentence for typical cases in that class, a rela-

tively broad category into which most cases will fall". Aggravating and mitigating factors "define the peripheries" of this broad category of "typical" cases; these factors identify the "relatively narrow circumstances that tend to make a given case atypical and place it outside the relatively broad presumptive middle ground." *Ibid.* (quoted with approval by the Alaska Supreme Court in *State v. Parker*, 147 P.3d 690, 695 (Alaska 2006)).

■ By enacting AS 12.55.165 and 175, the legislature effectively gave the judicial branch (in particular, the three-judge statewide sentencing panel and the appellate courts) the authority to create "non-statutory" aggravating and mitigating factors—*i.e.*, sentencing factors that expand the lists codified in AS 12.55.155(c)-(d). For example, in *Smith v. State*, this Court adopted the non-statutory mitigator of extraordinary potential for rehabilitation. 711 P.2d at 571–72.

■ But this judicial authority to create non-statutory aggravating and mitigating factors must be exercised in conformity with the legislature's sentencing policy choices. As we explained in *Dancer v. State*, the judicial power to establish new aggravating and mitigating factors is a legislatively sanctioned instance of the court's common-law power to develop the law. 715 P.2d 1174, 1179 n. 3 (Alaska App.1986). And when courts exercise this common-law power to declare the law, "the guiding principle is that they should not exercise this authority in disregard of existing constitutional and statutory provisions." *Dayton v. State*, 120 P.3d 1073, 1080 (Alaska App.2005), quoting *Hosier v. State*, 957 P.2d 1360, 1364–65 (Alaska App. 1998).

In *Smith*, we concluded that it was proper for us to create a non-statutory mitigating factor based on a defendant's extraordinary potential for rehabilitation because this factor was "integrally related to the *Chaney* [477 P.2d 441 (Alaska 1970)] sentencing criteria" (*i.e.*, the sentencing criteria codified in AS 12.55.005), and because, if a sentencing court ignored a defendant's demonstrated uncommon potential for rehabilitation, there would be "a tremendous risk ... that [the defendant's] sentence [would] be imposed without appropriate regard for the [sentenc-

ing] goal of rehabilitation." 711 P.2d at 570–71. For these reasons, we concluded that the legislature did not intend "to preclude realistic, individualized consideration of the [defendant's] need and potential for rehabilitation in cases involving first felony offenders". *Id.* at 571.

On the other hand, in *Totemoff v. State*, 739 P.2d 769 (Alaska App.1987), we rejected a proposed non-statutory mitigating factor because we concluded that the proposed mitigator was inconsistent with legislative intent.

The proposed mitigating factor in *Totemoff* was that a second felony offender's prior conviction was for a felony of lesser seriousness (*i.e.*, a lesser class of felony). When the Alaska Legislature originally enacted the presumptive sentencing law, this factor was codified as a statutory mitigator: *see* former AS 12.55.155(d)(8). But the legislature later repealed this mitigator, on the ground that it made little sense to "reward" offenders whose criminal behavior was getting progressively worse. *Totemoff*, 739 P.2d at 776 n. 5. Given the legislature's decision to repeal this mitigating factor, we concluded that the courts could not be permitted to undo what the legislature had done, by resurrecting the repealed statutory mitigating factor as a non-statutory factor:

> [A] court should not [adopt] a nonstatutory mitigating factor ... [if] the legislature specifically rejected that factor for inclusion in AS 12.55.155(d). Where the legislature has expressly addressed a consideration, such as the relationship between a defendant's past conduct and his present offense, and [has] imposed limitations on the [sentencing] court's power to consider that relationship in mitigation of [a defendant's] sentence, the [sentencing] court should not [adopt a non-statutory] mitigating factor [that does not comply] with [those] limitations; to do so is to [adopt] a common law development inconsistent with legislation.

*Totemoff*, 739 P.2d at 776–77.

The unsuitability of a proposed non-statutory mitigator may stem from the fact that the legislature debated that mitigating factor and refused to enact it, or (as in *Totemoff*)

because the legislature enacted that mitigating factor and then later repealed it. But sometimes a proposed non-statutory mitigator will be unsuitable because, if adopted, it would conflict with sentencing policies that the legislature has expressed in other ways.

An example of this latter situation was presented in *Johnson v. State*, 762 P.2d 493 (Alaska App.1988). *Johnson* did not involve a proposed non-statutory mitigator, but rather a proposed interpretation of one of the statutory mitigators codified in AS 12.55.155(d).

The defendant in *Johnson* appealed the sentence he received for first-degree sexual abuse of a ten-year-old child.[5] One of Johnson's claims on appeal was that the sentencing judge should have found his offense to be mitigated under AS 12.55.155(d)(13)—now renumbered as subsection 155(d)(12). This mitigator applies to cases where "the harm caused by [the defendant's] conduct [is consistently] minor and inconsistent with the imposition of a substantial period of imprisonment".[6]

We held that the superior court properly rejected this proposed mitigating factor.[7] One of our reasons for reaching this conclusion was that the legislature had enacted fairly severe sentences for first-degree sexual abuse of a minor. Because the legislature "clearly intended a substantial period of imprisonment for those convicted of sexual abuse of a minor", we held that, even in mitigated cases, it would violate this legislative intent if a sentencing court were to treat the sexual abuse of a ten-year-old child as a "minor" offense that was "inconsistent with the imposition of a substantial period of imprisonment". 762 P.2d at 496.

We believe that this same reasoning requires us to reject Smith's proposed mitigating factor based on the immature brain development of teenagers and young adults in their early to mid-twenties.

Under Alaska law before 1994, any person under the age of 18 who was charged with a felony was prosecuted and (if found guilty) punished under the juvenile delinquency laws contained in Title 47, chapter 10 of the Alaska Statutes. But in 1994, the Alaska Legislature amended the coverage of the juvenile delinquency laws by enacting former AS 47.10.010(e), a statute that is now codified as AS 47.12.030(a). Under this statute, 16– and 17–year–olds who are charged with certain serious felonies (such as first-degree assault, the charge against Smith in this case) are prosecuted and, if found guilty, punished as adults.[8]

---

5. 762 P.2d at 494–95.

6. *Id.* at 495–96.

7. *Id.* at 496.

8. AS 47.12.030(a) provides:

When a minor who was at least 16 years of age at the time of the offense is charged by complaint, information, or indictment with an offense specified in this subsection, this chapter and the Alaska Delinquency Rules do not apply to [that] offense ... or to any additional offenses joinable to it under the applicable rules of ... criminal procedure. The minor shall be charged, held, released on bail, prosecuted, sentenced, and incarcerated in the same manner as an adult. If the minor is convicted of an offense other than an offense specified in this subsection, the minor may attempt to prove, by a preponderance of the evidence, that the minor is amenable to treatment under this chapter. If the court finds that the minor is amenable to treatment under this chapter, the minor shall be treated as though the charges had been heard under this chapter, and the court shall order disposition of the charges of which the minor is convicted under AS 47.12.120(b). The provisions of this subsection apply when the minor is charged by complaint, information, or indictment with an offense

(1) that is an unclassified felony or a class A felony and the felony is a crime against a person;

(2) of arson in the first degree;

(3) that is a class B felony and the felony is a crime against a person in which the minor is alleged to have used a deadly weapon in the commission of the offense and the minor was previously adjudicated as a delinquent or convicted as an adult, in this or another jurisdiction, as a result of an offense that involved use of a deadly weapon in the commission of a crime against a person or an offense in another jurisdiction having elements substantially identical to those of a crime against a person, and the previous offense was punishable as a felony; in this paragraph, "deadly weapon" has the meaning given in AS 11.81.900(b); or

(4) that is misconduct involving weapons in the first degree under

(A) AS 11.61.190(a)(1); or

(B) AS 11.61.190(a)(2) when the firearm was discharged under circumstances manifest-

This change in the law demonstrates a major shift in legislative policy toward older juvenile offenders who commit serious crimes. Instead of treating these offenders leniently on account of their youth, the legislature has decided that these offenders should be prosecuted and punished under the same rules that apply to adults.

If this Court were to recognize "developmental immaturity" as a non-statutory mitigator that applies to all of these offenders, our action would run contrary to this legislative policy. Our recognition of this proposed non-statutory mitigator would, in effect, create a presumption that these older teenagers (indeed, all offenders younger than their mid-twenties) should be treated more leniently, and our decision would require the superior court to transfer the sentencing of all of these younger offenders to the statewide three-judge sentencing panel—since the three-judge panel is the only sentencing court authorized to consider non-statutory aggravating and mitigating factors.

In his supplemental brief, Smith argues that our recognition of his proposed mitigating factor would not have these sweeping consequences. He asserts that "not ... *every* youthful offender would automatically be entitled to this [proposed] mitigator". (Emphasis in the original) Rather, Smith argues, "[t]he onus [would be] on the [individual] defendant to prove this mitigator" by presenting "evidence [relating] to the offender, his behavior, and the offense".

But after making these conclusory assertions that individualized proof will be required, Smith fails to explain what kind of individualized proof he is talking about. We are at a loss to know what Smith is referring to. His own offer of proof in the superior court was not an individualized offer of proof. Smith did not present evidence that *he personally* had immature brain development. Rather, Smith presented evidence that essentially *all* young adults (*i.e.*, all persons who are younger than their mid-twenties) do not yet have fully developed brains, and we therefore should not expect them to have the same level of judgement and impulse control as fully mature adults.

ing substantial and unjustifiable risk of physi-

If Smith is asserting that individual defendants would still have to prove that this neurological immaturity had a substantial effect on their decision or willingness to engage in criminal behavior, then we believe the answer to this assertion is the one given by Judge McKay: a youthful offender's neurological immaturity can be considered (on an individualized basis) under the rubric of the existing non-statutory mitigator of extraordinary potential for rehabilitation.

For these reasons, we conclude that we should not recognize "developmental immaturity" as a non-statutory mitigator. We are not saying that we distrust the scientific evidence that Smith presented to the superior court. Rather, we conclude that, absent a convincing argument that the penalties enacted by the legislature contravene a provision of the constitution, the legislature remains the entity that should decide whether this scientific research calls for a modification of the rules of sentencing, or for changes in the penalty ranges for crimes committed by youthful offenders.

*Conclusion*

The judgement of the superior court is AFFIRMED.