**Serena Michelle JOSEPH, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–10945.**

Court of Appeals of Alaska.

Dec. 13, 2013.

---

Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before: MANNHEIMER, Chief Judge, ALLARD, Judge, and COATS, Senior Judge *.

## OPINION

MANNHEIMER, Judge.

Serena Michelle Joseph received a traffic ticket for speeding. At the trial of this traffic ticket, Joseph took the stand and testified that she had not been driving the vehicle when the police officer observed the speeding violation. Joseph was later charged with, and convicted of, perjury for giving this testimony.

At her perjury trial, Joseph asked the judge to let her introduce a video re enactment made by her defense investigator—a video which, Joseph claimed, showed that it would have been impossible for the police

---

* Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

officer to have identified the physical characteristics of the driver of the car. The trial judge refused to let Joseph introduce this video, and Joseph contends that this ruling was error. We conclude that the trial judge did not abuse his discretion in making this ruling.

In addition, Joseph appeals the sentence she received for her perjury conviction. Joseph argues that the sentencing judge relied on an improper legal rationale when he rejected her proposed mitigating factor, AS 12.55.155(d)(9) (conduct among the least serious within the definition of the offense). We agree with Joseph on this issue, and we therefore vacate the judge's ruling on mitigator (d)(9) and direct the judge to reconsider this matter.

*Underlying facts regarding Joseph's request to introduce the video*

While on patrol in early February 2009, headed north on Boniface Parkway, Anchorage Police Officer Christopher Ritala saw a Chevy van traveling south on Boniface Parkway at a high rate of speed. The speed limit was 45 miles per hour, and Ritala estimated that the van was traveling at 65 miles per hour. Ritala then used the radar in his patrol car to get a more accurate determination of the vehicle's speed; the radar reading was 67 miles per hour.

Ritala testified that he was able to identify the driver of the van as a lighter-skinned black female with "wiry" hair.

Ritala executed a u-turn and followed the van. The van made several turns, and Ritala briefly lost sight of it, but he soon found the van parked outside a house. Ritala testified that, when he arrived, Joseph was either still in the driver's seat or near the door of the vehicle.

During their ensuing conversation, Joseph never expressly admitted that she had been speeding, but she told Ritala that she had been driving home from work, that she needed to use the bathroom, and that she did not feel comfortable using a public facility. Joseph supplied Ritala with her driver's license, registration, and proof of insurance. She never said that someone else had been driving the vehicle, or that Ritala was ticketing the wrong person.

Joseph decided to contest the speeding ticket, and the case went to trial several months later. At the trial, Joseph testified that she had not been driving the van. She stated that her brother was the one driving the van, and that she had arrived in a different vehicle. Joseph further testified that, by the time Ritala arrived at the house, her brother had already left. Joseph's brother then took the stand and corroborated Joseph's account.

The magistrate presiding over the trial found Joseph guilty of speeding. He declared that Joseph and her brother had both committed perjury. Ritala then referred the case to the district attorney's office, leading to perjury indictments against Joseph and her brother.

Joseph and her brother were tried jointly in a single trial. Officer Ritala was the only witness for the State. To impeach Ritala's account of events, Joseph's attorney sought to introduce a video filmed by a defense investigator. This video was intended to be a re-enactment of Ritala's initial observations of the van as it traveled south on Boniface Parkway, except that both the van and the investigator's car (from which the video was being shot) were traveling at the speed limit (45 miles per hour).

According to Joseph's attorney, this video demonstrated that Ritala could not have observed the kind of identifying information he claimed to have seen—*i.e.*, that the driver of the van was a lighter-skinned black female with wiry hair. In particular, the defense attorney claimed that the video showed that such observations were not possible, given the vehicles' relative speed and the reflective glare of the van's windshield.

But Ritala testified that the video did not accurately depict what a person could see under those conditions. Specifically, Ritala noted that the video camera produced a one-dimensional view, while a person would see things in three dimensions, and from a shifting aspect. Ritala also pointed out that a person's eyes are able to "track" the driver of another car in a way that a video camera

can not (*i.e.*, focus attention on the driver, to the exclusion of other details of the scene).

To explain the factors he was talking about, Ritala drew an analogy to trying to capture the motion of a pitched baseball with a video camera. To the video camera, the ball might appear to be a blur. But a human observer would be able to constantly refocus their eyes, make small adjustments to their angle of observation, and track the baseball, thus yielding a much clearer perception of the ball's trajectory and spin.

Ritala concluded that, although the video accurately depicted the physical scene on Boniface Parkway, the video did not accurately depict what he was able to observe.

The trial judge denied the defense request to introduce the video. The judge concluded that the video did not accurately depict Ritala's opportunity to observe the driver of the van—that there were too many discrepancies between the conditions under which the video was shot and the conditions that existed on the day of Ritala's observations.

*Why we uphold the trial judge's ruling*

■ On appeal, Joseph argues that the video constituted an "experiment" to test the credibility of Ritala's assertions that he was able to observe certain identifying characteristics of the driver of the van as the van went by him. Joseph acknowledges that there might be arguable differences between the conditions surrounding Ritala's original observations and the conditions under which the video was shot. But Joseph argues that these potential differences were immaterial to the purpose of the videotaping experiment, and thus the differences were not significant enough to render the video inadmissible.

■ Under Alaska law, evidence of an experiment is admissible "only if the conditions of the experiment were substantially similar to the conditions at the time of the event in issue." *Beck v. State Department of Transportation and Public Facilities*, 837 P.2d 105, 113 (Alaska 1992).

*Beck* explains that, even though there may be identifiable differences between the conditions of the experiment and the conditions of the event, this fact, standing alone, does not mean that the experiment lacks "substantial similarity" to the event. Rather, the legal concept of "substantial similarity" assumes that there will be some differences, or at least some arguable differences. To assess whether these differences defeat a finding of "substantial similarity", a trial judge must evaluate several factors.

■ First, the judge must identify the real purpose of the experiment. *Beck*, 837 P.2d at 113. As the supreme court explained in *Bierria v. Dickinson Manufacturing Co.*, 36 P.3d 654, 658–59 (Alaska 2001), the concept of "substantial similarity" hinges on what the experiment is offered to prove. Even though there are identifiable dissimilarities between the circumstances of the experiment and the real-life event being litigated, the experiment can still be "substantially similar" if these dissimilarities are irrelevant to what the proponent of the experimental evidence is trying to prove.

■ Next, the judge should assess the degree to which the experiment is a subject of precise science, and whether the experiment would be considered valid by persons skilled or knowledgeable in the field which the experiment concerns. *Beck*, 837 P.2d at 113.

■ If the judge concludes that the dissimilarities between the experiment and the event being litigated are indeed relevant to what the proponent of the experiment is trying to prove, then the judge must ask further questions: Are these dissimilarities likely to distort the results of the experiment to a degree that the result of the experiment is not relevant? Or can the dissimilarities be adjusted for, or explained, so that the jury gains a satisfactory understanding of how these dissimilarities affected the results of the experiment, and an understanding of which aspects of the results remain relevant? *Ibid.*

■ Because the test for "substantial similarity" comprises these several factors, and because reasonable judges might evaluate or weigh these factors differently, an appellate

court employs an "abuse of discretion" standard when it reviews a trial judge's ruling on this issue.[1]

Here, the video was offered for the purpose of showing that Ritala could not have observed the identifying characteristics of the driver of the van. The record reveals significant reasons to doubt the relevance or probative force of the video when offered for this purpose. Accordingly, we conclude that the trial judge did not abuse his discretion when he refused to allow Joseph to introduce the video.

*The superior court's rejection of proposed sentencing mitigator (d)(9)*

Because Joseph was a second felony offender, she was subject to a presumptive sentencing range of 4 to 7 years' imprisonment for her perjury conviction.[2] Joseph proposed two mitigating factors under AS 12.55.155(d): (d)(9) (that her conduct was among the least serious within the definition of the offense), and (d)(12) (that the harm she caused by her conduct, both in the present offense and in the past, has been consistently minor and inconsistent with a substantial term of imprisonment).

The sentencing judge ruled in Joseph's favor on mitigator (d)(12), but the judge rejected proposed mitigator (d)(9). Joseph appeals this adverse ruling.

Before we address the merits of Joseph's claim of error with respect to mitigator (d)(9), we must first address a preliminary issue that arises from this Court's decision in *Jordan v. State*, 895 P.2d 994 (Alaska App. 1995).

*(a) The rule announced in Jordan v. State, and why we now overrule that aspect of Jordan*

The defendant in *Jordan* argued that the harm caused by his conduct was consistently so minor as to be inconsistent with a substantial term of imprisonment—the mitigator that is currently numbered (d)(12) and which, at the time of *Jordan*, was numbered (d)(13).[3] In *Jordan*, this Court held that a defendant is not entitled to claim the benefit of mitigator (d)(12) unless the defendant also proves mitigator (d)(9)—*i.e.*, proves that the conduct underlying the defendant's current offense is among the least serious within the definition of the offense.

Here is the pertinent portion of the *Jordan* decision:

> Jordan's second proposed factor, ... AS 12.55.155(d)[ (12) ], calls for a two-pronged determination: first, the [sentencing] court must determine on a case-by-case basis that the defendant's present and prior crimes are consistently minor; second, the court must find that the past and present crimes, taken as a whole, are inconsistent with a substantial term of imprisonment.... Because the first prong of factor (d)[ (12) ] focuses on the seriousness of Jordan's current and past crimes, requiring a finding of minor harm for each offense, our conclusion that his current offense is not among the least serious in its class precludes [a] finding that ... mitigating factor [ (d)(12) ] has been established.

*Jordan*, 895 P.2d at 1000.

In Joseph's case (as we explained above), the superior court found that Joseph had proved mitigator (d)(12), but the court also found that Joseph had *not* proved mitigator (d)(9). Under the rule announced in *Jordan*,

---

1. *See Bierria*, 36 P.3d at 659. In general, see *Booth v. State*, 251 P.3d 369, 373 (Alaska App. 2011):

   The "abuse of discretion" standard applies to situations where (a) the law does not specify a particular "right" answer or response to the situation, but instead only specifies the factors or criteria that a judge should consider, and (b) reasonable judges, given the same facts and applying the correct criteria, might come to differing conclusions about how to deal with the problem. In other words, the "abuse of discretion" standard of review applies to situations where the law allows or requires the judge to exercise discretion—to reach a decision by considering and weighing various factors, and then doing what seems most fair under the circumstances.

2. *See* AS 11.56.200(c) (classifying perjury as a class B felony), and AS 12.55.125(d)(3) (prescribing a 4– to 7-year presumptive range for a second felony offender).

3. *Jordan*, 895 P.2d at 1000.

these two findings would be legally inconsistent, and we would therefore have to vacate the superior court's findings and direct the superior court to address these two mitigators again. (This is precisely what we did recently in *Hamilton v. State*, unpublished, Alaska App. Memorandum Opinion No. 5874 (September 5, 2012), 2012 WL 3877764 at *5.)

■ But we are now convinced that the *Jordan* rule is wrong, and that it was wrong at the time it was announced.[4]

Our primary reason for questioning the *Jordan* rule is that it renders mitigator (d)(12) largely superfluous or insignificant. Under *Jordan*, a defendant must prove mitigator (d)(9) before the defendant is eligible to invoke mitigator (d)(12). In essence, *Jordan* turns mitigator (d)(9) into a lesser component of mitigator (d)(12).

■ But under Alaska's presumptive sentencing laws, the proof of any *single* mitigating factor triggers a sentencing judge's authority to impose a sentence of imprisonment below the applicable presumptive sentencing range. Moreover, the *extent* of the judge's sentencing authority—*i.e.*, how far below the applicable range the defendant's sentence can be—is the same regardless of whether the defendant proves a single mitigator or a half-dozen mitigators. *See* AS 12.55.155(a).

In other words, the crucial distinction is between (a) cases where no mitigators are proved, and (b) cases where at least one mitigator is proved. Because of this, a defendant who proves mitigator (d)(9) gains no significant legal advantage by also proving mitigator (d)(12). Once the defendant proves mitigator (d)(9), the sentencing judge has the authority to reduce the defendant's sentence below the presumptive range. The defen-

dant is then free to *argue* that the judge, in exercising this authority, should consider the fact that the defendant has consistently caused relatively little harm—without having to prove this assertion by clear and convincing evidence, and without having to meet the other procedural requirements to prove mitigator (d)(12).

■ As this Court noted in *Carpentino v. State*, 42 P.3d 1137, 1142 (Alaska App.2002), "one of the primary rules of statutory construction [is] that a court should assume that the legislature did not enact redundant or useless statutes." Both this Court and the Alaska Supreme Court have declared that "[o]ne of the prime directives of statutory construction is to avoid interpretations that render parts of a statute inoperative or superfluous, void or insignificant." *Champion v. State*, 908 P.2d 454, 464 (Alaska App.1995), quoting *22,757 Square Feet, More or Less v. State*, 799 P.2d 777, 779 (Alaska 1990). Our holding in *Jordan* violates this principle.

Moreover, we conclude that the *Jordan* rule ignores an important difference between the wording of mitigators (d)(9) and (d)(12).

■ Mitigator (d)(9) declares that a defendant's sentence can be mitigated if "the conduct constituting the [defendant's present] offense was among the least serious conduct included in the definition of the offense". For this purpose, the word "conduct" includes the defendant's mental state and motive,[5] as well as the consequences (or potential consequences) of the defendant's conduct.[6]

Mitigator (d)(12), on the other hand, focuses solely on the *consequences* of the defendant's criminal conduct. Under (d)(12), a defendant's sentence can be mitigated if "the

---

4. Under the doctrine of *stare decisis*, when a controlling decision of this Court is called into question, "it is not enough ... to show that the [prior] decision was honestly debatable at the time, and that it might have gone the other way". Rather, before we overrule an earlier decision, we must be convinced that the decision "was originally erroneous"—in other words, was never legally justifiable—or that the decision "is no longer sound because of changed conditions". *Erickson v. State*, 950 P.2d 580, 587 (Alaska App.1997) (quoting *State v. Dunlop*, 721 P.2d 604, 610 (Alaska 1986)).

5. *See, e.g., McGee v. State*, 95 P.3d 945, 949 (Alaska App.2004); *Miller v. State*, 44 P.3d 157, 158 (Alaska App.2002); *Martin v. State*, 973 P.2d 1151, 1155–56 (Alaska App.1999); *Schuenemann v. State*, 781 P.2d 1005, 1007 (Alaska App.1989).

6. *Lewandowski v. State*, 18 P.3d 1220, 1222 (Alaska App.2001); *Parks v. State*, 731 P.2d 597, 597–98 (Alaska App.1987); *State v. Richards*, 720 P.2d 47, 48–49 (Alaska App.1986).

facts surrounding the commission of the [present] offense and any previous offenses by the defendant establish that the *harm* caused by the defendant's conduct is consistently minor and inconsistent with the imposition of a substantial period of imprisonment". (Emphasis added)

It is true that in *Ison v. State*, 941 P.2d 195, 198 (Alaska App.1997), this Court adopted a broad reading of the term "harm". We held that, for purposes of mitigator (d)(12), "harm" includes not only the actual physical injuries or property losses occasioned by the defendant's criminal conduct, but also "the risks ... [and the] disruption of the social fabric" that the defendant's criminal conduct entailed. Nevertheless, mitigator (d)(12)'s focus on the harm caused by the defendant remains narrower than the inquiry into the seriousness of the defendant's conduct that takes place under mitigator (d)(9).

Because of this, there will be times when, even though the defendant's current offense caused only minor harm, that offense would not qualify as "among the least serious within the definition of the offense" based on other factors. Thus, the defendant would not be able to prove mitigator (d)(9), even though the relatively minor consequences of his current offense would be fully consistent with proof of mitigator (d)(12).

This analysis suggests that a series of offenses causing only minor harm could qualify for mitigator (d)(12), even though none of these offenses, taken individually, would qualify as "among the least serious" for purposes of mitigator (d)(9).

Although the legislative commentary to mitigator (d)(12) is relatively terse, it implicitly supports this result. Mitigator (d)(12) was added by the legislature in 1980. *See* 1980 SLA, ch. 102, sec. 41. The accompanying legislative commentary provides only one example of what the legislature intended the mitigator to achieve:

One situation where this mitigator might be applicable is when the defendant has committed a number of felony property offenses, such as check forgeries, but they all involve relatively small amounts of money.

1980 Senate Journal, Supp. No. 44 (May 29), p. 26.

This legislative example suggests that even though the defendant's series of check forgeries might each have been a typical instance of the offense, in terms of the defendant's conduct and mental state, the defendant would nevertheless qualify for mitigator (d)(12) because of the consistently minor harm caused by these offenses.

■ For these reasons, we now overrule the portion of *Jordan* which held that a defendant must prove mitigator (d)(9) to be eligible to prove mitigator (d)(12). As applied to Joseph's case, this means that there is no legal inconsistency between the sentencing judge's decision in Joseph's favor on mitigator (d)(12) and the judge's rejection of mitigator (d)(9).

### (b) Why we overrule the superior court's rejection of proposed sentencing mitigator (d)(9)

■ When the sentencing judge explained why he concluded that Joseph's conduct was not among the least serious within the definition of perjury, the judge made statements suggesting that mitigator (d)(9) could *never* apply to the crime of perjury:

The Court: Lying under oath is lying under oath. Certainly, the whole reason the legislature chose to make [this offense] a [class] B felony is that they take it very seriously if someone [lies]. Whether it's ... a small claims [action] or a million-dollar civil lawsuit, whether it's traffic court or felony court, if you take the stand and take the oath, you're supposed to be telling the truth.

If the sentencing judge indeed meant to say that mitigator (d)(9) is inapplicable when a defendant is sentenced for perjury, then the judge rejected mitigator (d)(9) for an improper reason.

We agree with the sentencing judge that the legislature's decision to classify perjury as a class B felony reflects the legislature's judgement that perjury is a serious crime. But this same reasoning applies to *every* class B felony (and to every class A and

unclassified felony as well). Even when a defendant has committed an offense that the legislature deems serious, the function of mitigator (d)(9) remains the same: to allow sentencing courts to identify those instances in which the defendant's conduct is among the least serious within the definition of the offense.

The State acknowledges this potential problem in the sentencing judge's remarks, but the State argues that the sentencing judge did not mean that mitigator (d)(9) can never apply to a perjury sentencing.

The State notes that the perjury statute, AS 11.56.200(a), encompasses any and all "false sworn statements", and not just false testimony in court. See AS 11.56.240(2), which defines "sworn statement" (for purposes of perjury prosecutions) as "[any] statement knowingly given under oath or affirmation attesting to the truth of what is stated, including a notarized statement", as well as "[any] statement knowingly given under penalty of perjury under AS 09.63.020."

Based on this broad definition of "sworn statement", the State argues that Joseph's sentencing judge was really trying to say that lying under oath *while testifying in court* can never be among the least serious forms of perjury.

We reject the State's argument for two reasons. First, although the State's suggested interpretation of the sentencing judge's remarks might be plausible, it is by no means obviously true. Thus, we would in any case ask the judge to clarify his remarks.

Second, it is by no means obvious that an in-court act of perjury could never be among the least serious types of perjury. For example, a witness might lie about something that is completely immaterial to the decision of the case, simply because the truth would be embarrassing to the witness or to some other person who the witness cares about. Thus, even if we assume that the sentencing judge meant that an act of perjury committed while testifying in court can never be "among the least serious", this assertion is questionable.

We therefore vacate the judge's decision regarding mitigator (d)(9), and we remand Joseph's case to the superior court for reconsideration of this issue.

*Conclusion*

Joseph's conviction for perjury is AFFIRMED, but we REMAND Joseph's case to the superior court for renewed proceedings regarding mitigator (d)(9).